[No. H037940. Sixth Dist. Dec. 20, 2012.]

In re K.C. et al., Persons Coming Under the Juvenile Court Law.
SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff
and Respondent, v.
J.P., Defendant and Appellant.

## Counsel

Valerie E. Sopher, under appointment by the Court of Appeal, for Defendant and Appellant.

Dana McRae, County Counsel, and Jane M. Scott, Assistant County Counsel, for Plaintiff and Respondent.

## Opinion

**RUSHING, P. J.**—This is a companion appeal to *In re K.C.* (Dec. 20, 2012, H037296) (nonpub. opn.) (*K.C. 2*), decided today. In that case we affirm orders of the juvenile court sustaining a supplemental petition and removing dependent child K.C. from the care of her father, appellant J.P. (Father). The question before us here is whether the court erred in a subsequent order terminating reunification services to Father in connection with both K.C. and her brother, Z.J. We have concluded that the record does not contain substantial evidence that reasonable services were provided to Father, in that the Santa Cruz County Human Services Department (Department) did little to secure a psychotropic medication evaluation recommended for Father in a psychological evaluation, and failed to demonstrate that it could not reasonably be expected to do more. Accordingly, we will reverse the order terminating services to Father.

### BACKGROUND

In his dealings with the Department, Father reportedly exhibited several traits that interfered with his ability to safely and effectively care for his

children. The evidence before the trial court at earlier hearings supported findings that Father tended to minimize potential hazards to the children, to resist advice or instruction concerning alternative parenting techniques, and to mistrust other persons necessarily involved in their care. (See *K.C. 2, supra,* H037296.) He also seemed to have some difficulty absorbing or retaining information. (*Ibid.*) His original case plan of April 7, 2011, expressed "a concern that you may suffer from mental health and/or cognitive functioning issues that can negatively impact your ability to parent appropriately." Accordingly, it directed him to "[p]articipate in one psychological evaluation[] by a Juvenile Court approved evaluator and follow any and all recommendations made by that evaluator including, but not limited to: participation in a medication assessment and/or participation in counseling (individual, family or otherwise)."

Father underwent a psychological evaluation in July 2011, leading to a written report in mid-September. The report noted that, according to Father's mother (Grandmother), he had a history of mental illness on his father's side; she said that " 'one of each generation on his dad's side has schizophrenia.' " The evaluator himself found that Father "present[ed] with an air[] of oddity" and "social discomfort," with "an aloof, paranoid and irritable style." He also "demonstrate[d] difficult[y] with concentration in tracking events and occurrence[s]." Father's responses to a *"Parent Stress Index"* showed "a strong endorsement of defensive responding with unusually high endorsement of 'difficult child', indicating significantly distressed parent-child dysfunctional interactions. It is fair to say he feels insecure in her [*sic*] ability to raise her [*sic*] child, and overwhelmed by the requirements of childrearing or childcare. His coping mechanisms present as deficient and in need of more education and further training."

The evaluator arrived at the following diagnosis: On Axis I, mood disorder with obsessive-compulsive features, subject to ruling out posttraumatic stress disorder, and coupled with "Identity Problem" and "Cannabis Abuse (by history)" and on Axis II, "Paranoid Personality [D]isorder (preliminary)." The evaluator opined that Father "can parent, however, additional steps are necessary on his part to be safe to do so. Reunification services are recommended, as long as this parent is moving forward in helping himself to the resources made available to him." Services that "should be offered to treat the diagnosis" included "[m]edication and therapeutic management through psychotropic evaluation and treatment for possible mood and thought disorder."

The evaluator apparently faxed his report to the social worker on September 20, 2011. According to the latter, she discussed the matter with Father on September 30, at which time he told her, " 'You would have to tie me down

to get me to take medication. I don't believe in the stuff.' " Nonetheless he met with her and her supervisor on October 14 to discuss "his willingness to follow through with the recommendations of the psychological evaluation." She later described Father as "tangential in his conversation, in some moments he would state, 'My life is fine. I am happy with my life. I don't see how medication would help me. I don't have any problems.' " At the end of the meeting, however, he "stated that he [wa]s willing to meet with a psychiatrist." On October 25, 2011, the social worker reported that she intended to "follow through with arranging an appointment with a psychiatrist for a medication evaluation."

At some point the social worker apparently sent a copy of Father's psychological evaluation to a public clinic, variously referred to below as "Adult Mental Health" and "County Access Team." She testified that she told Father to go to the clinic and "ask about a medication evaluation based on the recommendations of that report." She instructed him to inform the clinic "that he was interested in medication, not that the Department was forcing him to, or that it was a court ordered thing to do." She testified that for a would-be patient to acknowledge acting under such direction was "[s]ometimes . . . a block . . . to get access with Adult Mental Health. It's important to go in and say he's interested for himself to get a medication evaluation."

Father made three visits to Adult Mental Health, apparently in late October and early November. "The first time he went," according to the social worker, "he told me that he went in and asked for a court ordered psychological evaluation. He was told that they don't do court ordered psychological evaluations. I asked him to—again, to try and go back again and that it's important to once again that he go in and say that he's coming in for himself to have this medication evaluation. And so he went again and had the same sort of encounter, that someone was telling him that he needed to come and that he didn't feel that he needed medication." After that she asked Father's therapist to accompany him on a third visit to Adult Mental Health. "They did go," she testified, "and again, my understanding is that the interview was pretty brief, because once again [Father] wasn't really asking for this help, he was just there as part of his case plan, part of what the Court had ordered him to do." Questioned by the court, she reaffirmed earlier testimony that, as summarized by the court, Father and his therapist had gone "to the County Access Team to seek meds. Because he did not meet their criteria and is not acknowledging mental health challenges they said they can't help him. They recommended he seek SSI."

According to the therapist's testimony, when he accompanied Father to the clinic, a doctor told them that in the absence of symptoms more severe than Father's, and without "Medi-Cal or some other kind of funding source,"

Father would have had to "come in begging and pleading" in order to get the requested drug evaluation and treatment. The therapist testified that the clinic seemed to be looking for patients who were "fairly disheveled, kind of hearing voices, just off the streets, kind of scared, traumatized, probably looking like an untreated Vet almost." He understood the governing criterion to be "[a]ctive psychosis." The therapist believed the clinic had also "balked . . . a little bit" when Father "said he was court ordered to come into Adult Mental Health." He did not believe their criteria would have been met if Father had "show[n] up and said I have a diagnosis that's interfering with my ability to be a safe parent and I need assistance." "What the doctor said is he would need to be begging and pleading." The clinic advised Father to "just continue doing the things using other support you can get."[1]

On November 9, 2011, a family therapist at the county department of mental health wrote a letter to no specified addressee confirming that Father had applied for services from that agency on October 27, at which time he "was assessed as not meeting this agency's criteria for treatment services, and given referrals to other therapy resources." On November 8, Father had presented himself again, "reporting that he had once again been instructed to come here for assessment and services. My meeting with him was essentially a repeat of the earlier contact, [Father] not evidencing symptoms of major mental illness meeting this agency's criteria for services, nor disclosing significant treatment history as an adult. It was clear that [Father] was here only in response to the recommendations of other parties to the case at issue, and would not have sought treatment on his own."

On January 30, 2012, after a hearing that took up parts of two days, the court made findings as to both children that reasonable services had been provided to both parents and that there was "no probable cause for return as to the minor's father," such that reunification services to him must be terminated. As to the mother, however, the court found "substantial cause for return," and ordered that she receive another six months of services. The court reduced Father's visitation with the children to "a minimum of two time(s) [*sic*] a month, supervised."

On February 14, 2012, Father filed a notice of appeal from the orders placing both children out of his home, terminating reunification services, and reducing visitation.

---

[1] The Department did not appear to contest the therapist's account of this event. Indeed the social worker appeared to accept his description of the clinic's "criteria," including that for an applicant to receive medication without manifesting active psychosis, "he would have to be begging and pleading" for it.

## DISCUSSION

■ The question before us is whether the trial court could properly find on the evidence before it that reasonable services had been provided or offered to Father. That question is crucial where, as here, a dependent child has been removed from a parent's home. "Typically, when a child is removed from a parent, the child and parent are entitled to 12 months of child welfare services to facilitate family reunification. These services may be extended to a maximum of 18 months. (§ 361.5, subd. (a).) If, at the 12-month hearing, [the department] does not prove, by clear and convincing evidence, that it has provided reasonable services to the parent, family reunification services must be extended to the end of the 18-month period. (§§ 361.5, subd. (a), 366.21, subd. (g)(1); *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164 [39 Cal.Rptr.2d 743] . . . .)" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 [83 Cal.Rptr.3d 229].)

Here the central facts do not appear to be in dispute: (1) Father underwent a psychological evaluation as called for in his case plan; (2) that evaluation identified certain psychological conditions that interfered with Father's ability to address the issues preventing the children's safe return to him; (3) the evaluation recommended a further examination to determine the extent to which these conditions might be alleviated through psychotropic medication; (4) the Department's only attempt to secure such a pharmacological evaluation was to send Father to a public mental health clinic; (5) the clinic found that Father did not meet its criteria for treatment, and declined to undertake the recommended evaluation; and (6) the Department made no attempt to secure the evaluation elsewhere or to demonstrate that no other avenues were reasonably available for securing the recommended evaluation.

■ Given these facts, we fail to see how the Department's provision of services could be found reasonable under any standard of proof. " 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." . . .' . . . The department must make a ' " 'good faith effort' " ' to provide reasonable services responsive to the unique needs of each family. . . . '[T]he plan must be specifically tailored to fit the circumstances of each family . . . , and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . .' . . . The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success. . . . The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case. . . . '[T]he record should show that the supervising agency identified *the problems leading to the loss of custody*, offered services designed to remedy those problems, maintained *reasonable* contact with the

parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010–1011 [70 Cal.Rptr.2d 603], citations omitted; see *Amanda H. v. Superior Court, supra,* 166 Cal.App.4th 1340, 1345.)

It is true that the reasonableness of the services provided may depend to some degree upon the parent's willingness to cooperate in the completion of his or her reunification plan, and that Father here exhibited a certain recurring reluctance to fully cooperate with the Department and others involved in his children's care. The psychologist's report indicated, however, that this less-than-full cooperativeness was itself a product of psychological conditions that might be responsive to pharmacological treatment. Had Father refused to submit to the recommended medication evaluation, or refused to take such medications as might be recommended, his refusal would presumably have sustained a finding that reasonable services were provided. But here he was never placed in a position where such refusal was possible. The " 'problems leading to [his] loss of custody' " (*Mark N., supra,* 60 Cal.App.4th at p. 1011) all appeared to stem from his mental health issues.[2] The Department quite properly undertook to identify those issues. But when it came to *addressing* them, the Department appeared to delegate the burden of finding and obtaining suitable services to Father himself—despite the high likelihood that the very issues necessitating treatment would interfere with his ability to obtain it.

Counsel for the Department seemed to implicitly acknowledge this Catch-22 in argument to the court, when she asked, "[I]s a mental health disability something you can just fake it until you make it, like in recovery? Can a person who has a mental disability who really doesn't believe it participate in services until they get what they want, until they have a desire to overcome that want, and then work to overcome it? Is that possible? *The Department believes it is possible.* However, the Department believes that it has not happened in this case." (Italics added.) That is, the Department seemed to acknowledge that Father could only receive the needed psychotropic evaluation from the clinic by "fak[ing] it," i.e., by pretending not to be in denial about his psychological issues, even though the denial was itself a manifestation of those issues.

---

[2] We refer here to the issues that led to the removal of K.C. from Father's care after she had been placed with him at the original dispositional hearing. (See *K.C. 2., supra,* H037296.) As to both children, the original removal from parental custody was based on causes not attributable to Father, i.e., the severe injuries inflicted upon Z.J. while in the mother's home. This fact—that Father's parenting ability had come under microscopic inspection and criticism due to the actions of others—could hardly fail to play into the suspicious and indeed "paranoid" tendencies identified by the psychological evaluator.

The Department presented no evidence to support counsel's belief. Indeed, counsel appeared to have made a deliberate choice not to inquire into its soundness. She introduced the passage just quoted by stating that when Father's therapist was testifying, she had "almost had the desire to ask" him about the feasibility of such an approach. Later she frankly admitted her own ignorance on the subject: "I don't know if you can fake it until you make it, or if you have to actually accept that your psychiatric diagnosis says something about you." Yet the Department's handling of this issue necessarily presupposed that Father could, without further treatment, either "fake it until [he] ma[d]e it" or "actually accept that [his] psychiatric diagnosis sa[id] something about [him]." No basis for such a belief appears in the record. In its absence, we fail to see how the Department's failure to do more to secure the recommended evaluation—or show that no more could be done—can be reconciled with the requirement of reasonable services.

Certainly the record fails to justify the Department's failure to consider other service providers when the public clinic declined to provide the needed evaluation. Asked whether the Department had "do[ne] anything . . . to try and get [Father] a . . . medication evaluation any place else," the social worker replied, "No," and then implied that she had left that to the clinic, recounting a conversation in which a doctor there told her that if a patient came in reporting symptoms of depression, and the clinic "couldn't give that person medication" under its own treatment criteria, "they would refer [the person] to other places." Asked further whether "anybody tr[ied] to brain-storm" about "is there a way we can get this done someplace else," she testified to her belief that Father's therapist had discussed with him an entity identified only as "HPHP." This apparently meant the Homeless Persons Health Project, a program of the county health department.[3] The record contains no evidence that this entity could have furnished or arranged the required medication evaluation.

The social worker implied that she considered a medication evaluation futile because of Father's stated opposition to psychotropic medications. She testified that the "underscoring issue" was his having "stated over and over again that he's not willing to take medication, doesn't want to take medica-tion." These of course are two quite distinct things. A person may not want to undergo treatment, but that does not mean he will refuse to do so when the treatment is offered. Here it was never offered. The Department made no attempt to show that Father would in fact have refused medication if presented with a choice between taking it and permanently losing custody of his children. The only concrete evidence on the subject is the social worker's

---

[3] See Santa Cruz County Health Services Agency Public Health Department—Homeless Persons Health Project <http://www.santacruzhealth.org/phealth/2homeless.htm> (as of Dec. 20, 2012).

written report that on September 30, Father had told her, " 'You would have to tie me down to get me to take medication. I don't believe in the stuff.' " But this was a mere 10 days after the psychological evaluation had been faxed to the social worker, and may have been the first time Father heard about it. Despite this initial expression of opposition he did eventually betake himself to the clinic, not once but three times, in an attempt to secure the recommended evaluation. The Department could not pounce upon stale expressions of reluctance as an excuse for its own inaction.

Nor did the Department make any attempt to show that psychotropic medications could not have sufficiently ameliorated Father's psychological challenges to enable him to successfully reunite with one or both of his children. The only evidence before the court on that subject came from Father's therapist, who testified under questioning by counsel for the children that he had seen improvement with psychotropic treatment in patients with diagnoses resembling Father's. When successful, medications provide "an opportunity to kind of dampen some of the intensity of the symptom that they are struggling with," permitting the patients to "begin to practice and develop other habits." He added that this was particularly true of patients in a psychiatric hospital or group home, and of course Father would not be in such a residential setting. But he would have a powerful motivation that many patients would lack: the likelihood that noncompliance would bring about the loss of his children. In any event, as we have said, the Department was required to make a "good faith effort," including " 'reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Amanda H. v. Superior Court, supra*, 166 Cal.App.4th 1340, 1345.) "The effort must be made . . . ," moreover, regardless of "the prospects of success." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].) A forecast of failure could not provide an excuse for refusing to try.

Respondent offers no coherent argument in support of the trial court's finding of reasonable services. The closest respondent comes is to assert that the finding is "supported by the evidence as outlined above." Nothing in the brief explains or justifies the Department's failure to arrange for a medication evaluation for Father.

■ Appellant cites a number of cases concerning the state's obligation to provide reasonable services to mentally or intellectually challenged parents. In *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [184 Cal.Rptr. 778], the court rejected any idea that a diagnosis of schizophrenia precluded a mother's reunification with her children. Such a diagnosis "should be the court's starting point, not its conclusion. Rather than mandating a specific disposition because *the mother is schizophrenic, the diagnosis should lead to an in-depth examination of her psychiatric history, her present condition, her previous*

response to drug therapy, and the potential for future therapy with a focus on what affect her behavior has had, and will have, on her children." (*Ibid.*) Thirteen years later the same court considered a case in which services had been terminated for a mother diagnosed with bipolar disorder and exhibiting various other mental problems. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774 [42 Cal.Rptr.2d 200].) "If mental illness is the starting point," wrote the court, "then the reunification plan, including the social services to be provided, must accommodate the family's unique hardship." (*Id.* at p. 1790.) The court acknowledged that the statutes permit a termination of services when the parent suffers a mental disability " 'that renders him or her incapable of utilizing those services.' " (*Ibid.*, quoting Welf. & Inst. Code, former § 361.5; see now Welf. & Inst. Code, § 361.5, subd. (b)(2).) However, the department there had made no attempt to invoke this section and had not presented the testimony of two mental health experts, as the statute then required.[4] The court concluded that "[f]amily reunification efforts must be tailored to fit the unique challenges suffered by individual families unless a . . . section 361.5 disability is proven by clear and convincing evidence. In other words, the juvenile dependency system is mandated by law to accommodate the special needs of disabled and incarcerated parents," including those disabled by mental illness. (*In re Elizabeth R.*, at p. 1792.)

Father also cites *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1331 [255 Cal.Rptr. 498], where the court declared that "the rights of a developmentally disabled parent may not be terminated without first assessing whether the services offered by the state through regional centers may enable the family of a disabled person to remain intact." More recently, in *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425–1426 [136 Cal.Rptr.3d 505], the court reaffirmed that "[t]he juvenile court and child welfare agency must accommodate the special needs of disabled and incarcerated parents." The parents there, who faced multiple disabilities including intellectual challenges, were not shown to have received reasonable services.

Respondent's only comment on these cases is that Father is not developmentally delayed, but rather interacts too intensely with others and "shows a paranoid type of belief about others being against him and an inability to trust others." This merely describes his condition; it does not relieve the Department of its duty to tailor services to address that condition, its effects, or both. On this record the Department was under a clear obligation to arrange for the psychotropic assessment recommended in the psychological evaluation, at least in the absence of a clear showing of circumstances making it

---

[4] The statute now requires only that services must be provided "unless competent evidence from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within the time limits specified in subdivision (a)." (Welf. & Inst. Code, § 361.5, subd. (c).)

unreasonable to do so. No such showing was attempted. Accordingly, the finding that reasonable services were offered or provided cannot be sustained, and the order terminating services must be reversed.

This conclusion makes it unnecessary to address Father's further contentions, including that the visitation schedule imposed by the Department was not reasonably suited to promote reunification, and that the court abused its discretion by reducing visitation after terminating services. We assume that on remand the court will reexamine the visitation issue in light of our directive to grant additional reunification services.

### Disposition

The order terminating services is reversed with directions to afford Father additional services unless new circumstances prevailing upon remand support a finding that services are unwarranted.

Premo, J., and Elia, J., concurred.