Filed 8/19/14  In re A.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.B., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. J.S., Defendant and Appellant. | A140267 (Sonoma County Super. Ct. No. 4019DEP) |
| J.S., Petitioner, v. SUPERIOR COURT OF SONOMA COUNTY, Respondent, SONOMA COUNTY HUMAN SERVICES DEPARTMENT, et al., Real Parties in Interest. | A140853 (Sonoma County Super. Ct. No. 4019DEP) |

In this juvenile dependency proceeding, J.S., mother of A.B., appeals from an August 26, 2013, order, entered after a six-month status review, which found J.S. had been offered reasonable services to reunify with her child, and the Indian Child Welfare Act (25 U.S. C. § 1901, et seq.; ICWA) did not apply in this case.  J.S also petitions for

1

extraordinary writ review of a January 13, 2014, order, entered after a 12-month status review, which found she had been offered or provided reasonable services to reunify with her child, terminated reunification services, and set a hearing pursuant to section 366.26 of the Welfare and Institutions Code[1] to determine the permanent placement of her child. On our own motion, we consolidated the appeal and writ proceeding, and stayed the section 366.26 hearing until further order of this court.

We agree with J.S. that there is no substantial evidence supporting the juvenile court's 12-month status review finding that, by clear and convincing evidence, the Sonoma County Human Services Department (the agency) offered or provided J.S. with reasonable services for her mental condition. We also agree with J.S. that the record does not contain sufficient evidence demonstrating the agency's compliance with the ICWA.[2] Consequently, we shall reverse the order filed on August 26, 2013; vacate so much of the January 13, 2014, order, as found J.S. had been offered or provided reasonable services, terminated reunification services, and set a section 366.26 permanency hearing; and remand the matter for further proceedings. The stay of the section 366.26 hearing that was ordered by this court shall automatically dissolve on the issuance of the remittitur.

## FACTS[3]

### A. Background

Shortly before the birth of A.B. (the child), the then 20-year-old J.S. (mother) was living in a shelter and the then 33-year-old father was homeless having been banned from

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

[2] In light of our determination, we do not need to address J.S.'s contentions challenging (1) the juvenile court's finding at the sixth-month status review that the agency had offered or provided reasonable services, and (2) the juvenile court's findings at the 12-month status review that there was no substantial probability that the child could be returned to J.S.'s custody by the 18-month status review, and that the agency had provided J.S. adequate visits with the child.

[3] Because A.B.'s father has not sought review of any orders entered against him, we set forth only those facts necessary to resolve J.S.'s contentions raised in this consolidated proceeding.

2

the shelter for assaulting mother. The child was born in September 2012. Mother tested positive for marijuana at delivery but the child did not test positive for the drug. The next day, the agency detained the child, and four days later, filed a petition under section 300, subdivision (b) (failure to protect), asking the juvenile court to take jurisdiction of the child. The agency's request was based on recent domestic violence incidents between the parents and mother's use of marijuana.

A combined jurisdiction and disposition hearing was held on December 10, 2012. The court sustained the failure to protect allegations in the petition, as amended, and declared the three-month-old child to be a dependent of the court. The child was removed from the parents' custody and the agency was granted custody of the child for placement in a foster care home. Mother was granted reunification services, requiring her to participate and successfully complete individual counseling, parenting education, and substance abuse treatment after an evaluation. Two days after the hearing, mother moved to Alameda County to live with relatives. At a three-month status review held in March 2013, the court denied mother's request to transfer the case to Alameda County.

B.     Six-Month Status Review

On May 30, 2013, the agency filed a report for the six-month status review, that was then scheduled for June 6, 2013 and later continued to August 26, 2013. The agency social worker recommended termination of mother's services and setting a section 366.26 hearing to determine the child's permanent placement. Although mother had not participated in the recommended services in Sonoma County, she had attempted to meet her case plan objectives by participating in services in Alameda County. Mother had a substance abuse evaluation at a clinic in Alameda County and was attending day-treatment groups, albeit she had missed many sessions because she was residing with her mother who lived some distance from the clinic. Mother could participate in counseling services at a facility in Alameda County, but the agency social worker was not able to confirm that mother was in therapy. Additionally, since April 23, 2013, mother had supervised visits with the child, which took place every other week at a church in Santa Clara County, the foster placement county for the child.

On August 23, 2013, the agency filed a supplemental report. The agency social worker withdrew her recommendation for termination of services, and instead, recommended that mother continue to receive services. At that time mother was pregnant with her second child with father. On her own, mother had located and entered an Alameda County residential treatment facility, and she had been residing there for several weeks. The residential treatment facility provided mother with stable housing and all services required by her case plan and allowed child visits to take place at the facility. The agency social worker reported that mother's "participation in a residential treatment program demonstrates that the young mother is trying her best to fulfill the requirements necessary to reunify with her only child. Her success in the program would demonstrate that [mother] is more capable of making responsible decisions and possibly being a good parent."

In its August 26, 2013, order, entered after the six-month status review, the juvenile court found, in pertinent part, that there was a substantial probability that, with the continuation of services, the child might be safely returned to mother's physical custody during the extended service period. The court's latter finding was based on "the social worker's report, including the facts stated in the Analysis Section and the following: [¶] The mother is participating in residential drug treatment; [¶] The mother has consistently and regularly contacted and visited the child; [¶] The mother has demonstrated the capacity and ability both to complete the treatment plan objectives and provide for the child's safety, protection, physical and emotional well being and special needs; [¶] The mother is to comply with the case plan outlined in the report." The court found, by clear and convincing evidence, that mother had been offered or provided reasonable services, and further found that "[t]he extent of progress made by the mother toward alleviating or mitigating the causes necessitating placement has been adequate." The matter was continued for the 12-month status review, which was initially scheduled for October 31, 2013.

## C.     12-Month Status Review

On October 25, 2013, in anticipation of the 12-month status review, the agency filed a report recommending termination of mother's services and the setting of a section 366.26 hearing to determine the child's permanent placement.  Mother had been in residential treatment for two or three months and the anticipated duration of her substance abuse treatment was one year.  As to mother's case plan compliance, the agency social worker reported: "[Mother] receives mental health support from her [residential treatment] counselor . . . a third year PsyD student and intern . . . .  The program [staff] reported that they had concerns about [mother's] concrete level of understanding and functioning.  The mother does not seem to be able to understand information that is presented to her, even when told repeatedly and in different ways. [Mother] has cognitive delays that cause her to function as a young adolescent of 13 or 14 years of age.  Therefore, it has been difficult to make much progress in any treatment. [¶] [The residential treatment mental health counselor] is working with [mother] on social and life skills.  The mother has difficulty maintaining relationships and thinking creatively in order to resolve problems. [¶] A psychological evaluation was completed in October 2013 by [a named psychologist].  The written report is not yet available, but [the psychologist] provided some information about her initial impressions.  [The psychologist] states that [mother] is either delusional or suffering from Schizotypal Personality Disorder.  The mother may have suffered from a post-partum psychotic breakdown or have a mood disorder.  [The psychologist] is certain that [mother] suffers from 'massive PTSD [Post-Traumatic Stress Disorder].' "  The residential treatment mental health counselor reported that by October 23, 2013, mother had settled into the program, seemed to be much more grounded, was better managing her anger, had tested clean in random drug testing, and was determined to live a clean and sober life.  Mother also was participating in both group activities with children at the facility and one-on-one parenting activities with her child.  However, the residential treatment parenting instructor reported that mother had trouble understanding her child's protective boundaries and developmental stages and had difficulty distinguishing between allowing

5

her child to express preferences and removing the child from potentially harmful situations. The agency social worker also reported on mother's visits with the child. Since August 2013, mother had supervised visits with the child for 90 minutes once a week at the residential treatment facility. The agency social worker and the foster family social worker reported concerns about mother's ability to parent the child after observing mother's visits.

The agency social worker's 12-month status review report concluded with the following analysis: "This is a sad case because the factors that brought [the child] into protective custody are directly related to trauma the mother experienced in her childhood. [Mother] grew up in an abusive home with a stepfather who repeatedly told her that he was not her father, unlike her half-sister. Her biological father did not play a parental role and [her mother] was not consistently involved. This young mother grew up around people with untreated substance abuse and mental health problems. She saw negative and abusive relationship patterns as normal. [¶] It is easy to understand how [mother] became involved with [the child's father], an older man who seemed to know . . . how to function in the world. Despite physical and emotional abuse in the relationship, [mother] remained involved with the [child's] father for months; even when it became clear that [she] and [father] had incongruent ideas about how they wanted to live their lives. [Mother] seems to have a fear or inability to manage her life independently. She relies on precarious relationships to meet her needs. [¶] For example, prior to entering [the residential treatment facility], mother alternated between living with her mother and her sister. When these relatives lost their housing or wanted her out, [mother] was left with no choice but to leave and seek other housing possibilities. On one occasion, [mother] could not get into her mother's apartment building, though she knew her mother was home. Instead of figuring out how to get into the building to her mother's apartment, [mother] chose to sleep outside in the cold. This type of poor problem-solving skills makes it difficult to imagine [mother] being able to safely or consistently meet the needs of a young child with special needs. [¶] With long-term, intensive therapy and possibly treatment with psychotropic medication, [mother] may be able to function at her

6

chronological age.  However, the term of treatment would exceed the time restraints of Family Reunification Services, even if services were extended to the eighteen-month review.  Therefore, it is necessary to recommend that Family Reunification Services be terminated for [mother].  It is recommended that a 366.26 hearing be set."

The 12-month status review was ultimately held on January 13, 2014. The agency social worker gave an "update" concerning mother's progress since the agency's October 2013 report.  Mother continued to receive services at the residential treatment facility where she been living for five or six months.  Mother's residential treatment counselor reported that as of November 2013, mother was participating and doing better in all of the components of her case plan.  The residential treatment staff did not indicate how much longer mother would need to be in the program, but "they were open to keeping her for . . . up to two years."  By the time of the hearing, the agency social worker had received a written report concerning mother's psychological evaluation.  The agency social worker explained that she had not earlier requested a psychological evaluation because initially mother's conduct was not "a big concern."  As the agency social worker and her supervisor continued to work with mother, "it grew to be a greater concern."  Therefore, the agency staff believed there was a need to get a psychological assessment to make sure the agency staff was going in the right direction.  The agency social worker called the residential treatment facility to arrange for the psychological evaluation, and the facility director stated her staff had been planning to call the agency social worker to arrange for a psychological evaluation.

The agency social worker testified that the psychological evaluation indicated that mother had an "Axis 1 diagnosis" of "unspecified bipolar disorder," "substance-abuse disorder, primarily marijuana," "post-traumatic stress;" with "a rule out of schizoaffective disorder, bipolar type," and an "Axis 2 diagnosis" of "schizotypal personality disorder with erratic and traumatic Tourette's" and "strong 'B' clusters."  According to the agency social worker the Axis 2 diagnosis of schizotypal personality disorder evidenced "a chronic diagnosis," seen as not "typically fixable, just sometimes treatable . . . ongoing mental-health problems the person would probably struggle with for their lifetime[ ]."

7

The psychological evaluation included a recommendation that "medication management and monitoring be an essential part of any ongoing treatment plan to ensure [mother] maintain[ed] stability and maximize[d] her gains." However, as far as the agency social worker knew, "that's not happening." The agency social worker tried to refer mother to two different places in Oakland, but mother was never seen by a psychiatrist because she did not qualify for health insurance necessary for one program and a second program had a waiting list. The agency social worker also asked the clinical director of the residential treatment facility to assist mother in finding medication-management services.

Regarding visitation, the agency social worker confirmed that since August 2013, mother had been consistently visiting the child for 90 minutes once a week at the residential treatment facility. At the end of November 2013, the residential treatment staff indicated mother was more receptive to learning about the child's health and nutritional needs, and mother asked for longer visits. The visits remained once a week because at that time the agency social worker still had concerns about the child's basic safety and feeding problems during visits, and there was also the possibility that services would be terminated by the court.

The agency social worker believed mother participated regularly in services during the most recent review period. However, mother was only halfway toward meeting the goals of her case plan and, according to the agency social worker, it was not likely mother would be able to complete her case plan by the "18-month mark." The agency social worker was sure there were parents who had Axis 2 diagnoses who could take care of their children. However, the agency social worker opined that mother's psychological evaluation indicated it was "unlikely," "given [her] psychological profile, she would be able to establish and maintain an appropriate structure on her own." When asked if mother would ever be able to safely parent the child outside the confines of a structured program, the agency social worker responded, "I guess contingent upon whether or not she got on some psychotropic medications and was able to show, demonstrate that she could be stable on her own for like six months. By that time, she would have another baby, and so then that would make it complicated, again, that she wouldn't necessarily be

8

able to parent [the child.]" The agency social worker could not see mother living on her own with the child in the next six months because of the child's special needs and mother's responsibility for a second child. The agency social worker believed that if services were extended, mother might have overnight visits with the child in the next four to six months at the residential treatment facility. But, the agency social worker projected that mother would not be able to care for the child on her own until she had left the residential treatment facility for at least six months to one year.

Mother testified that since August 2013 she had been participating in the programs offered at the residential treatment facility. She also testified as to her understanding of the reasons that the child became a dependent of the court, what she had learned in the residential treatment programs, her understanding of the child's special needs, her ability to parent the child, and her current relationship with the child's father.

After closing argument by counsel, and prior to rendering its ruling, the court commented "it's just an unfortunate consequence [of] . . . the merging of both the mental-health issues and the domestic-violence issues that have become a part of this record here." In its January 13, 2014, order, the juvenile court adopted the agency's proposed findings and orders in the agency's October 25, 2013, report. Specifically, the court found, by a preponderance of the evidence, that returning the child to mother's care would create a substantial risk of detriment to the child based on the agency social worker's report, including that mother had failed to participate regularly and make substantive progress in court-ordered treatment programs and services. The court also found, by clear and convincing evidence, that mother had been provided or offered reasonable services, but further found that she had made only "minimal" progress toward alleviating or mitigating the causes necessitating the child's placement. The court terminated reunification services after finding there was no substantial probability that if services were continued the child would be safely returned to mother's physical custody during the extended services period. The latter finding was based on the agency social worker's report, including the facts stated in the analysis section of the agency's

9

October 25, 2013, report.  The court set a section 366.26 hearing to determine the child's permanent placement.

## DISCUSSION

### I.     Substantial Evidence Does Not Support Juvenile Court's 12-Month Status Review Finding of Reasonable Services

In her writ petition mother argues, and we agree, that the juvenile court erred in finding at the 12-month status review that the agency had offered or provided reasonable services for mother's mental condition.

The legal standards governing the issue before us are well established.  "When offered, reunification services must be provided for at least six months unless earlier terminated for cause (§ 361.5, subd. (a)(2)), and for up to 24 months when it appears such extended services will result in the dependent child's return to the parent's or guardian's custody (*id.*, subd. (a)(3), (4)).  Meanwhile, court status reviews must occur at least every six months, to determine whether reunification efforts should continue or be terminated for cause, and whether the dependent child may be returned to the parent or guardian. (§§ 366, 366.21.)"  (*In re Ethan C.* (2012) 54 Cal.4th 610, 626.)  The juvenile court may not terminate services and set a section 366.26 permanency hearing at the 12-month status review "unless it finds by clear and convincing evidence reasonable services have been offered or provided to the family.  (§ 366.21, subds. (e) & (g)(1).)"  (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 (*Tracy J.*).)  The agency must make a showing of " '[a] good faith effort' to provide reasonable services responding to the unique needs of each family."  (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306; see *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790 (*Elizabeth R.*).)  An agency will be found to have offered reasonable services if it has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as . . . offering more intensive rehabilitative services where others have failed)."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  In evaluating the juvenile court's finding of

10

reasonable services, "[w]e review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.' " (*Tracy J.*, *supra*, at p. 1424.)

The record shows that despite mother's mental condition, she initially demonstrated a capacity to understand and comply with case plan requirements. On her own, she secured services in Alameda County to enable her to reunify with the child. Nevertheless, after she entered residential treatment and was seen on a daily basis by experienced staff, it became apparent she was suffering from a mental condition that was interfering with her ability to benefit from services. Although there was no dispute that mother was actively participating in services, "not surprisingly," she showed only signs of minimal progress as reported by both the residential treatment staff and the agency social worker, and as later found by the juvenile court. (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1329 (*Victoria M.*).) The agency social worker appropriately arranged for mother to complete a psychological evaluation. And, by October 2013, the social worker had received an oral report from the psychologist, who had preliminarily diagnosed with certainty that at a minimum mother was suffering from "massive PTSD," a significant psychological impairment.[4]

Once the agency social worker learned of mother's mental condition, the juvenile dependency law required the agency to reassess services by making reasonable efforts to assist mother in securing services for her mental condition. (See *Elizabeth R., supra,* 35 Cal.App.4th at p. 1790; *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [a diagnosis of

---

[4]     PTSD is listed and defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders - V, which is a handbook used by mental health professionals. PTSD " 'would be expected to cause psychological problems.' " (*People v. Cortes* (2011) 192 Cal.App.4th 873, 906-907, fn. 15.)

mental illness is the "starting point, not its conclusion"].) However, the record does not demonstrate the agency made such reasonable efforts in this case. In the agency's October 2013 report, after noting the mother's preliminary diagnoses made by the evaluating psychologist, the agency social worker reported that "[w]ith long-term, intensive therapy and possibly treatment with psychotropic medication," mother "may be able to function at her chronological age." Yet, the agency social worker failed to report at that time on any attempts to secure services for mother's now-known mental condition. More than two months later at the January 13, 2014 hearing, the agency social worker testified she had received a written psychological evaluation evidencing that mother was suffering from significant psychological disorders. The agency social worker detailed her attempts to secure mother the services recommended by the evaluating psychologist. She made single unsuccessful contacts with two programs and a request of the staff at mother's residential treatment facility to locate services in Alameda County. There is no record evidence the agency social worker ever followed up on her request to the residential treatment staff to determine if mother was offered or being provided the services recommended by the evaluating psychologist. Instead, and most significantly, the agency social worker testified that, as far as she knew, mother had not and was not receiving any services recommended by the evaluating psychologist. Thus, we are compelled to conclude that on this record there is no substantial evidence supporting the juvenile court's 12-month status review finding, by clear and convincing evidence, that mother had been offered or provided reasonable services for her mental condition. (See *In re K.C.* (2012) 212 Cal.App.4th 323, 333-334 (*K.C.*) [juvenile court's finding that reasonable services were offered or provided to father could not be sustained where the agency failed in its "clear obligation to arrange for the psychotropic assessment recommended in the psychological evaluation, at least in the absence of a clear showing of circumstances making it unreasonable to do so"].)

Turning to the agency's contentions, we are not persuaded by its reliance on the concept that an agency is not required to lead a parent "by hand," and that mother "also has a responsibility to follow through with referrals and access resources." Having

12

ultimately identified that mother was suffering from a significant psychological impairment, the agency could not "delegate the burden of finding and obtaining suitable services to" mother. (*K.C., supra,* 212 Cal.App.4th at p. 330.) If mother had refused to participate in services for her mental condition, her "refusal would presumably have sustained a finding that reasonable services were provided. But here [she] was never placed in a position where such refusal was possible." (*Ibid.*) Also, we are not persuaded by the agency's argument that even if services had been provided or continued mother would not have been able to reunify with the child by the 18-month status review. The Legislature never intended a "strict enforcement" of the statutory time limits for services "to override all other concerns including preservation of the family when appropriate." (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1465 (*Renee J.*); see *In re Derrick S*. (2007) 156 Cal.App.4th 436, 439 [statutory time limits for services are not "immutable"].) Although it is possible that mother would not successfully reunify with the child, even if additional services had been provided, "[a] forecast of failure [cannot] provide an excuse for refusing to try." (*K.C., supra*, at p. 332.)

We conclude our decision by noting that under the juvenile dependency statutory scheme a parent's mental disability allows an agency to recommend that a court bypass services (§ 361.5, subd. (c)), and that services need not be provided to a parent if the court finds, by clear and convincing evidence, that the parent is suffering from a mental disability that renders him or her incapable of using such services (§ 361.5, subd. (b)(2)). However, at no time in this case did the agency seek to meet the statutory requirements to demonstrate that mother was incapable of using services due to a mental disability (§ 361.5, subd. (c)), and the juvenile court make no such finding (§ 361.5, subd. (b)(2); see Fam. Code, § 7827, subds. (a), (c)). [5] As a consequence, once the juvenile court

---

[5] Section 361.5, subdivisions (b)(2), and (c), provide, in pertinent part, that before the disposition hearing, the social worker shall prepare a report that discusses whether reunification services should be provided and may allege that services should be denied because a parent is incapable of using services due to mental disability, and the juvenile court may bypass reunification services if, by clear and convincing evidence, mental health professionals establish that even with services, the parent is unlikely to be capable

granted mother services, the agency "was required to make a 'good faith' effort,' including ' "reasonable efforts to assist [mother] in areas where compliance proved difficult . . . ." ' [Citation.] 'The effort [had to] be made . . .,' moreover, regardless of 'the prospects of success.' " (*K.C., supra,* 212 Cal.App.4th at p. 332.)

Because we conclude that on this record there is no substantial evidence supporting the juvenile court's 12-month status review finding that mother was offered or provided reasonable services for her mental condition, we shall vacate so much of the January 13, 2014, order, as found that mother had been offered or provided reasonable services, terminated reunification services, and set a section 366.26 permanency hearing. (See *K.C., supra*, 212 Cal.App.4th at p. 334.) On remand the juvenile court is directed to determine whether reunification services should be continued in light of the current conditions and living circumstances of mother and the child. (See *In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242 (*Aryanna C.)* ["the juvenile court has the discretion to terminate the reunification services of a parent at any time after it has ordered them, depending on the circumstances presented"].) [6]

---

of adequately caring for the child within the time limits for reunification. The Welfare and Institutions Code sections refer the juvenile court to the Family Code for the definition of "mental disability" and that evidence of two experts is required to make a finding of "mental disability." (§ 361.5, subd. (b)(2), see Fam. Code, § 7827, subds. (a), (b).) Although the agency here did not at the outset of the juvenile dependency proceeding seek to deprive mother of services based on her mental condition (§ 361.5, subd. (b)(2), (c)), on remand, the agency may, if appropriate, file a section 388 petition to modify the court's dispositional order to provide that mother should be denied services based on her mental condition. (§ 388, subd. (a)(1); see *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 879 ["a section 388 petition is an appropriate vehicle for modifying a dispositional order and ordering a bypass of reunification services"].)

[6] Our conclusion that the agency failed to offer or provide reasonable services for mother's mental condition "makes it unnecessary to address [mother's] other contentions [challenging the January 13, 2014, order], including that the visitation schedule imposed by the [agency] was not reasonably suited to promote reunification . . . ." (*K.C., supra*, 212 Cal.App.4th at p. 334.) In light of our directive that the juvenile court is to reconsider the issue of reunification services, we assume the review shall encompass a reexamination of the visitation issue if appropriate. (*Ibid.*) Also, we need not address mother's challenge to the juvenile court's earlier six-month status review finding of

14

**II.     The Agency Failed to Show Compliance with the ICWA**

    *A.        Relevant Facts*

After the child was detained, the parents initially reported the child might have Indian ancestry solely based on possible Cherokee heritage of father's relatives. The agency made the appropriate Bureau of Indian Affairs (BIA) and tribal notifications on September 19, 2012 based on information provided by father and giving only mother's legal name. In its jurisdiction report filed on September 28, 2012, the agency initially asked the court to find that the ICWA might apply based solely on father's claim of Indian ancestry and to continue the matter to allow for responses from BIA and the Cherokee Tribes. Thereafter, in its disposition report filed on October 19, 2012, the agency social worker reported that the ICWA might apply based on mother's new assertion of Indian ancestry through her paternal relatives. The agency social worker stated that "efforts were made to contact maternal relatives to gather information as a follow-up to the mother's statement at Court on October 3, 2012, stating she may have Native American ancestry on her father's side of the family." After the combined jurisdiction and disposition hearing on December 10, 2012, the court found there was "currently insufficient information to determine if the child may be an Indian child," and

---

reasonable services that was made in its August 26, 2013, order. Even assuming an error, on review of the January 13, 2014, order, we now grant mother the relief she requests, namely, a remand for the juvenile court to determine whether reunification services should be continued in light of the current conditions and living circumstances of mother and the child. Because mother does not otherwise challenge the court's substantive findings in the August 26, 2013, order, we would ordinarily dismiss the appeal from that order as moot. However, the August 26, 2013, order must be provisionally reversed pending further proceedings to ensure the agency's compliance with the ICWA, as we explain in Part II., *post*, of this opinion. If the child is found to be an Indian child, the court shall conduct all further proceedings in compliance with the ICWA and all applicable state law and rules of court implementing it. (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784-786 (*Nicole K.*); *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 342-343 (*Jonathon S.*).) If the child is found not to be an Indian child, the juvenile court shall reinstate the August 26, 2013, order, and conduct further proceedings on whether reunification services should be continued in light of the current conditions and living circumstances of mother and the child.

15

the agency was directed to "update" the court by the next hearing and request appropriate ICWA findings.

In the May 30, 2013 agency report filed for the six-month status review, the agency social worker asked the court to find that the ICWA did not apply for the following reason: the agency had heard from the Cherokee Tribes and none of the tribes would intervene because their enrollment records did not show the child was an Indian child. The agency social worker, however, did not describe the results of her inquiry of mother's relatives regarding any Indian ancestry of the child. Nevertheless, the agency social worker asked the court to make the following findings: "Indian Child Welfare Act Notice & Applicability. [¶] The information provided by a parent or other interested person concerning the child's possible Indian ancestry on both parents' sides is too speculative, remote and uncertain and does not provide the Court with reason to know that the child is or may be an Indian child; [¶] The Indian Child Welfare Act does not . . . apply in this case." At the six-month status review hearing, none of the parties mentioned compliance with the ICWA. In its August 26, 2013, order, entered after the six-month status review, the juvenile court did not adopt the agency's proposed ICWA findings in total. The court found only that the ICWA did not apply in this case.

### B. Analysis

Although mother did not raise the ICWA issue in the juvenile court, "[t]he generally accepted rule in dependency cases is that the forfeiture doctrine does not bar consideration of ICWA . . . issues on appeal. [Citation.] 'As [it] has [been] held, "[t]he [ICWA] requirements serve the interests of the Indian tribes 'irrespective of the position of the parents' and cannot be waived by the parent." [Citation.] A parent in a dependency proceeding is permitted to raise ICWA . . . issues not only in the juvenile court, but also on appeal even where, as here, no mention was made of the issue in the juvenile court.' " (*In re Alice M*. (2008) 161 Cal.App.4th 1189, 1195.)

On this record, we must agree with mother that the agency failed to demonstrate that it made a proper inquiry concerning the child's potential Indian ancestry as envisioned by the ICWA. There is no support in the record for the agency's argument

16

that mother's information about her Indian ancestry was too vague and speculative to trigger the ICWA notices as to her ancestry. The agency reported it made attempts to meet its duty to inquire once mother asserted that she believed the child might have Indian ancestry. The problem is that the record does not include a description of the results of the agency social worker's inquiry of mother's relatives regarding any Indian ancestry of the child. Thus, we cannot conclude the agency made a proper ICWA inquiry.

We also reject the agency's argument that any defects in the ICWA notices to BIA and the Cherokee Tribes were harmless. "The burden is on the [agency] to obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe or, if the tribe is unknown, to the BIA." (*In re Louis S*. (2004) 117 Cal.App.4th 622, 630.) The agency relies on *In re Cheyanne F*. (2008) 164 Cal.App.4th 571 (*Cheyanne F*.). There, the appellate court noted that "[d]eficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances." (*Cheyanne F., supra*, at p. 577.) In *Cheyanne F*., the deficiencies in the ICWA notice to the Blackfeet Tribe pertained to information concerning the mother, who claimed no Indian ancestry, and did not pertain to the father, the parent who claimed to be a registered member of the Blackfeet Tribe. (*Cheyanne F., supra*, at pp. 574-575.) Under those circumstances, the appellate court held the agency's failure to include mother's place of birth and names of her parents and grandparents in the ICWA notice was harmless error. The court reasoned that although the omitted information was required under ICWA regulations and section 224.2, "it does not follow that the omission of information concerning non-Indian relatives is necessarily prejudicial." (*Cheyanne F., supra*, at p. 576.) The court concluded that "in the absence of any indication that information concerning [mother's non-Indian] family was relevant to the tribe's inquiry, there is no basis upon which to conclude that the outcome would have been different if [the agency] had provided [mother's] place of birth and the information concerning her parents and grandparents." (*Id*. at p. 577.)

17

Unlike *Cheyanne F.,* in this case the accuracy and completeness of the information concerning mother's ancestry was highly relevant to any assessment of whether the child was an Indian child. Because the ICWA notices in this case contained no information about mother's relatives, no meaningful search could be conducted by either the BIA or the notified tribes. (See *In re Louis S., supra*, 117 Cal.App.4th at p. 630.) We are unable to discern whether there is a reasonable probability that the BIA and the notified tribes would still have been unable to determine that the child was an Indian child if given information about mother's relatives. Lastly, we are not persuaded by the agency's citation to *Adoptive Couple v. Baby Girl* (2013) __ U.S. ____, 133 S. Ct. 2552 (*Adoptive Couple*), in support of its harmless error analysis. In *Adoptive Couple*, the United States Supreme Court held that ICWA was not implicated where the biological father who claimed Indian ancestry never had either physical or legal custody of the child and abandoned the child before the birth. (*Id.* at pp. 2562-2563.) In this case mother had both legal and physical custody of the child and had not abandoned the child before the child was detained by the agency on the day after the child's birth.

Therefore, as a consequence of the agency's failure to demonstrate it made a proper inquiry of mother's relatives regarding any Indian ancestry of the child, we must remand the matter to the juvenile court with directions to order the agency to investigate and obtain complete and accurate information about any Indian ancestry through mother's relatives and, if necessary, provide the ICWA notices to BIA and any identified tribes. (*Nicole K., supra*, 146 Cal.App.4th at p. 785; *In re Jonathon S., supra*, 129 Cal.App.4th at p. 343.)

### III.    Conclusion

If the juvenile court determines the child is an Indian child, the court shall conduct all further proceedings in compliance with the ICWA and all applicable state law and rules of court implementing it. (*Nicole K., supra,* 146 Cal.App.4th at p. 785; *In re Jonathon S., supra*, 129 Cal.App.4th at p. 343.)

If the juvenile court determines the child is not an Indian child, the court is directed to conduct a new status review hearing at which it shall offer an additional six

18

months of reunification services to mother, unless new or different evidence supplies a proper legal basis for denying further services. (*Aryanna C., supra*, 132 Cal.App.4th at p. 1242.) Before the date of the new hearing, the agency may want to consider filing a section 388 petition requesting the court to modify its dispositional order to deny mother further reunification services based on her mental condition. (See fn. 5, *ante*.) In the event the agency files a section 388 petition, and if the court finds mother suffers from a mental disability that renders her incapable of benefiting from further reunification services, the court may enter a new order denying mother further services and setting a section 366.26 permanency hearing.

## DISPOSITION

In case no. A140267, the August 26, 2013, order is reversed. In case No. A140583, let a peremptory writ of mandate issue directing respondent court to vacate so much of its January 13, 2014, order as found mother was offered or provided reasonable services, terminated reunification services, and set a section 366.26 permanency hearing. On remand the juvenile court is directed to conduct further proceedings consistent with this opinion. The stay issued by this court shall automatically dissolve on the issuance of the remittitur.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

19