Filed 9/9/14  In re P.W. CA

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.W., JR., a Person Coming Under the Juvenile Court Law. | B252890 (Los Angeles County Super. Ct. No. CK93842) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>S.S. et al.,<br><br>        Defendants and Appellants. | |

APPEALS from orders and findings of the Superior Court of Los Angeles County. Deborah Losnick, Juvenile Court Referee.  Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant S.S.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant P.W., Sr.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and David Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case involving P.W., Jr., (minor), S.S. (mother) and P.W., Sr., (father) (collectively the parents) challenge the juvenile court's six-month review finding that returning the minor to their care posed a substantial risk of harm, and that they were provided with reasonable services.

We find no error and affirm.

## FACTS[1]

"**Background; the Referral; the Hospital Hold**

"The parents were married on October 7, 2011. Almost five months later, [in February], 2012, the minor was born premature and stayed in a neonatal intensive care unit for about a month due to respiratory distress. When the minor was released, he was placed on an apnea monitor. He suffered apneic episodes multiple times a day and stopped breathing. When he was comforted by his parents, the minor's breathing would resume. He was under the care of a pediatrician, Dr. Tan.

"In May 2012, the minor was exposed to cigarette smoke from his maternal grandmother (grandmother). The next day, his apnea monitor sounded 10 times in less than 12 hours. The Department received a referral alleging a threat of physical and emotional abuse by father. As reported, mother and father yelled and hit each other. Three or four times a week, the reporting party heard banging coming from the family's apartment. A neighbor disclosed that father slammed the minor into the tub because he did not want to give the minor a bath.

"A social worker visited the family and interviewed mother and father. They denied the existence of domestic violence in the home, though mother conceded that they did occasionally argue. She disclosed that she received therapy from Pacific Clinic, and that father and she also go to couple['s] therapy. According to mother, she had postpartum depression but was not on any kind of medication. Father reported that he was a patient at Regional Center, but further stated that he had never been diagnosed with

---

[1] We borrow, in large part, from our statement of facts in *In re P.W.* (Feb. 6, 2014, B247824) [nonpub. opn.].

a mental health disorder.  He denied slamming the minor in the tub.  There was no evidence that the minor had been injured.

"On May 18, 2012, the parents took the minor to Antelope Valley Medical Center due to 'breath holding spells.'  He was transferred to Miller's Children's Hospital for a higher level of care.

"The minor was diagnosed with acute bronchiolitis, laryngomalcia[2] and feeding problems, which resulted in a failure to thrive.  Medical personnel monitored the minor to determine if he needed a gastronomy tube (G-tube) because of his difficulties swallowing.  He had severe respiratory distress with episodes of decreased levels of oxygen in the body every five to 10 minutes.  He required oxygen at all times, and frequent deep suctioning.  A doctor spoke to mother and father regarding the minor's condition and what might need to be done to provide proper care, and nurses attempted to explain the severity of the situation.  The parents appeared unable to understand the medical issues and were resistant to treatment, saying that they did not give permission to have the minor treated.  They kept threatening to take the minor out of the hospital against medical advice.  Mother said that God did not give the minor tubes, so he should not have them.  During the next several weeks, the minor's need for oxygen and deep suctioning increased.  He received respiratory treatment by a therapist as needed and at varying frequency.  As his stay at the hospital continued, feeding problems progressed and he developed a rhinovirus.

"On June 4, 2010, mother informed a nurse that she did not want the minor to have a G-tube.  She said a G-tube was the 'easy way out' and perhaps if the minor received more than 10 minutes of occupational therapy a day, he would be able to eat better.  Father told a nurse, 'I want AMA (against medical advice)' and 'I just want to go home.'  In a Resident Brief Progress Note, Dr. Benjamin A. McDonald wrote:  '[The minor's] parents have been intermittently threatening to take the [minor] out of the hospital AMA throughout the day today.  I have personally spent at least 2 hours this afternoon in direct

---

[2]     The detention report described laryngomalcia as a condition 'where [the] upper larynx collapses inward during inhalation, causing airway obstruction.'

communication with the mother and father.  [Mother] stressed that she is concerned that placement of a [G-tube] could "cause my child to die" or to "get a lot of infections."  She has continued to state that she does not want a [G-tube] placed "for religious reasons" and "because only I know what is best for my baby."  She also seems upset that our social worker has been in contact with the [Department] worker who is assigned to their case.  Mother is very difficult to redirect.  [Mother] asked numerous times that I send them home with oxygen and that she would feed [the minor] at home.  I discussed with her at length why I was not comfortable sending [the minor] home while he was on oxygen. . . .  I do believe that the [minor] is not safe to leave the hospital while requiring frequent deep suctioning and oxygen.  If the mother starts insisting once again on leaving AMA[,] I believe it would be in the [minor's] best interest to be placed on a hospital hold.'  On the day Dr. McDonald wrote his note, Miller's Children's Hospital put a hold on the minor.

"**The Petition; the Detention Hearing; Information About the Parents**

"On June 7, 2012, the Department filed a petition pursuant to section 300, subdivision (b) of the Welfare and Institutions Code[3] alleging that the parents could not supervise or protect the minor.

"Following a hearing, the juvenile court found a prima facie case for detaining the minor. . . .

"The next day, the Department filed a last minute information for the court indicating that mother and father had both been dependents of the juvenile court,[4] and

---

[3]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[4]     Grandmother received voluntary family maintenance services in 2001 as a result of a referral alleging that her home was unsanitary, and she had bipolar disorder and was expressing suicidal ideation.  In 2005, her family came to the attention of the Department based on the same allegations, but it was additionally alleged that grandmother was smoking marijuana and physically abusing mother.  Grandmother told a social worker she wanted her children removed because she was so depressed that she wanted to kill herself.  Her children were placed with their father, and then later placed in foster care.

4

noting that mother had presented a letter from Dr. Tigran Gevorkian stating: 'Due to mental illness, [mother] has limitations regarding social interaction, coping with stress, etc. In order to help alleviate these difficulties, and to enhance her ability to live independently[,] . . . I am prescribing an emotional support animal[.]' The Department was unable to determine the nature of mother's disability, and how it affected her ability to care for the minor.

"According to father's regional center case worker, Mia Archie, father's current diagnosis was mild retardation.[5] However, in 2003, he had been diagnosed with posttraumatic stress syndrome and major depression disorder with psychotic features. He was not on any psychotropic or other medication, but he was in an independent living program, which included parent training.

"**The June 15, 2012, Interim Review Report**

"A letter from Birth and Family Services, Inc. was attached to the interim review report signed by a Department investigator named Son'a Williams (DI Williams). The report indicated that father was authorized to receive 60 hours of monthly parenting with living skills instruction and support, mother and father had been asking questions and educating themselves about the minor's needs, and a parent trainer would be present when they visited the minor.

---

Mother displayed 'defiance and chronic [absences without leave] from placement and she was never able to remain anywhere stable or receive mental health services.' Though jurisdiction was terminated, it was later reinstated when grandmother attempted suicide in her home with her children present. Mother continued to leave her placements and did not receive mental health services. According to mother, she was in foster care from age 11 to 17, and the reason she frequently left her foster homes was because she was mistreated by her caregivers. Father was a dependent of the juvenile court from 2001 to 2005. When interviewed, he alleged that he, too, was mistreated in foster care. Both parents expressed a desire to protect the minor from the foster system.

[5] Father reported that mother also was diagnosed with mild retardation. The interim review report for June 15, 2012, indicates the same. We note that in the appellate briefs, the parties refer to father's diagnosis of mild retardation, but not to mother's diagnosis.

5

"The Department reported that mother and father were receiving SSI benefits due to their mild retardation. Mother was open to receiving mental health services. DI Williams assessed the home where the parents had lived for about a year. It consisted of two bedrooms, one bath, a living room, and a kitchen, and the structure of the home met the Department's requirements.

"To explain the parents' resistance to a G-tube, mother informed a social worker during an interview that 'all we were trying to do was make the best decision for our kid. I read things on the [I]nternet and I saw a couple videos from [YouTube]. There was nothing positive about the [G-tube] procedure. I saw this girl, age 14, she was threatening to kill herself because she did not have a normal life. I want my son to be able to eat a hamburger. I [do] not want him to kill himself because he [cannot] have a hamburger. There was a girl on [YouTube] who stated she wished she never would have [received a G-tube].' Per mother, a doctor said the minor could have [a] G-tube for a day or the rest of his life. Mother was not satisfied with his response and asked that the medical staff contact the minor's primary physician, Dr. Chung. As reported by mother, her request was denied. She expressed concern that the minor would pull out a G-tube and then would either 'bleed out' or get an infection. Her preference was for the minor to be discharged from the hospital with oxygen.

"A letter from mother was attached to the interim review report. In that letter, she stated, inter alia, that she did not refuse necessary care for the minor. Rather, she wanted a second opinion, and she wanted the minor transferred to Huntington Memorial Hospital in Pasadena. She painted a picture of Miller's Children's Hospital as a place full of 'foul' practices, adversarial medical staff and adversarial hospital social workers. According to mother, the hospital social worker made false allegations against the parents to the Department.

"Father reported that mother and he were trained on how to use a 'breathing machine.' He explained to DI Williams that the parents had purchased a video monitor, and then stated that 'we just want our son to come home. We are willing to comply with the hospital recommendations.'

6

"**Insertion of a G-tube**

"Though mother and father were concerned about the scarring that would result from a G-tube, they eventually consented to one being placed. On June 27, 2012, a G-tube was inserted.

"**The July 3, 2012, Jurisdiction/Disposition Report**

"DI Williams once again interviewed the parents. Father denied threatening to . . . take the minor out of Miller's Children's Hospital. He said the parents wanted the minor transferred to Children's Hospital Los Angeles because it was more accessible. It took the parents two hours by train to get to Miller's Children's Hospital. In father's perception, the medical staff at Miller's Children's Hospital used the threat of contacting the Department to control the parents' decision making. Just thinking about the situation made him depressed. He did not want to be hospitalized, and he did not want to participate in therapy, but he needed an outlet. Mother said she wanted a second opinion before consenting to a surgical procedure, and she wanted the medical staff to wait two weeks before inserting a G-tube. She complained that the medical staff did not give her accurate information. According to her, the minor passed the Ph poll test, swallow test and bronchial study. Though he did not pass the 'OPM' study, she stated, '[I]f he was going to die he would have died already.' She believed that the medical staff was mistreating the minor because the suctions were frequently filled with mucous and the minor had a diaper rash. [Periodically], she would hear the medical staff giggling in the hallway. Her feelings would be hurt as she watched the minor turn purple from lack of oxygen.

"In a phone interview, DI Williams spoke to Dr. Stephanie Hertz on July 2, 2012. She had not seen the minor in a week. In Dr. Hertz's opinion, mother and father appeared 'very child like.' Linda Trabossi-Mathis (Trabossi-Mathis), a nurse practitioner from Miller's Children['s] Hospital, was also interviewed. She stated that the parents were learning to hook up the minor's feeding tubes, disconnect the tubes and flush them. They asked good questions and were able to recall information when asked to demonstrate what they had learned. [Trabossi-]Mathis consented to the parents coming

7

to the hospital on Saturday, June 30, 2012, and Sunday, July 1, 2012. They were scheduled to complete the minor's feeding on Saturday from 11:30 a.m. to 3:30 p.m. However, they missed the scheduled feedings and did not contact medical staff. At one point, the parents showed up at a shift change to complete a feeding. A nurse was able to complete a mock feeding with the parents, and they performed it well. DI Williams asked the parents why they missed visits. Mother said they were participating in an ILP Program at Para Los Ninos on June 30, 2012. On July 1, 2012, they arrived at a different time than scheduled because they failed to tell the agency worker from Birth & Family Services that they did not have transportation to and from the hospital. They missed a visit on July 2, 2012, due to lack of transportation.

"All mother's and father's visits were monitored.

"The Department reported that mother was diagnosed with bipolar disorder and was refusing medication. It stated that it 'has serious concerns . . . whether or not the [minor] can be safely maintained in the care of mother and father. Mother and father lack insight and do not appear to have the ability to appropriately care for the [minor], as they have frequently disregarded what is in the best interest of the [minor] (mother and father have missed three feedings).'

"In its recommendation, the Department urged the juvenile court not to release the minor to the parents' custody. It opined the parents would benefit from reunification services and further supervision.

"**The Plea of No Contest to Jurisdiction**

"On July 3, 2012, mother and father signed waivers of rights and pleaded no contest to the dependency petition. The juvenile court amended the petition to allege: 'The [minor] has significant medical issues which require juvenile court intervention to assist parents in caring for [the minor]. [This] situation[,] without court intervention[,] places the [the minor] at risk.'

"The petition was sustained.

8

"**The Last Two Weeks of July 2012**

"In mid-July 2012, DI Williams participated in a treatment meeting at the hospital. The primary concerns were gastro esophageal reflux and laryngospasms that caused the minor to frequently desaturate (drop in oxygen levels). The minor continued to be identified as 'high risk.' The medical staff reported that mother and father had not demonstrated the ability to care for the minor because they often appeared frustrated and required multiple prompts to address the minor's medical needs. They needed more coaching even though they had received two weeks of support and teaching services to address medical issues, which was far more than other parents received. Medical staff indicated that the minor had medical and physical issues, and expressed concern that the parents would not comply with discharge orders. Because they had transportation problems, medical staff was skeptical that mother and father would be able to transport the minor to and from his numerous medical and occupational therapy appointments. In the view of the medical staff, neither mother nor father showed any initiative. Rather, they had to be prompted by medical staff when the minor had feeding or breathing difficulty.

"When they met with medical staff to discuss their progress, mother and father were not receptive to medical staff's comments. Mother complained that medical staff was not communicating with them. The parents claimed that they made mistakes when feeding the minor because they were tired, had not been able to sleep and were being watched by the medical staff.

"By July 20, 2012, the minor was cleared for release. However, he required a pulsox machine to measure his oxygen and respiration. The machine could not be requested without a placement address. The Department opined that the minor could not be safely placed with the parents because they had not exhibited the ability to provide adequate care.

"On July 21, 2012, father did not know the minor's feeding schedule. He had to be reminded to feed the minor at 7:00 a.m. When he poured formula into a feeding bag, he did not close the roller clamp and ports. A nurse prompted father on how to prime the

9

line.  When he programmed the pump for 110ccs, the nurse had to tell him that the minor gets 120ccs for day feeds.  Mother and father forgot the minor's 10:00 a.m. feeding and had to be reminded.  Then, at 1:00 p.m., mother forgot to apply bacitracin to the G-tube site.

"At 2:00 a.m. the next day, mother once again had to be reminded to apply bacitracin, and father needed the nurse's instruction all throughout feeding the minor.  For the 7:00 a.m. feeding, mother attempted to pour fresh formula into the old formula.  The nurse told mother to empty the feed bag and rinse it before pouring the fresh formula into it.  Though mother competently performed the feeding, she left the rails down on the crib.  Later that morning, mother and father both asked if 24-hour care was over.  When the nurse explained that 24-hour care meant around the clock care, not care for one 24-hour period, father raised his voice and demanded to know why the nurse had not explained the process earlier.  Mother raised her voice, saying, '[W]e have stuff to do.  We go to church and do other things on the weekends.'  They both appeared frustrated, sighing and rolling their eyes when the nurse explained that the parents needed to be ready to take care of the minor on their own.  That night, after administering the minor's medication at 10:00 p.m., mother once again left the rails down on the crib.

"A few days later, father changed the minor's diaper and then, without washing his hands, removed the minor's feeding tube.  The father walked away from the crib without putting the rail back up.

"On July 26, 2012, the parents closed the door to the minor's room and nurses did not hear an alarm.  A nurse spoke to . . . them and explained that it was important to leave the door open.  They indicated that they had a right to privacy, closed the door and posted a sign citing to a California law pertaining to the right to privacy.  They refused to allow a nurse to draw the minor's blood.

"The next day, the minor's breathing difficulties escalated.  He was no longer cleared to be discharged.

10

**"The August 1, 2012, Disposition Hearings; Intervening Developments**

"At the initial disposition, the juvenile court ordered the minor detained in the hospital or shelter care. The hearing was continued.

"On August 3, 2012, the minor's medical case worker, social worker William Thomas (SW Thomas)[,] spoke by phone with Dr. Alexis Seegan who stated that the minor was cleared for discharge. She said that the parents were too forceful during feedings, and that they were not following instructions. An occupational therapy student reported that father had not fed the minor in two weeks. Also, she stated that mother knew the steps for feeding the minor but did not execute them without making errors, and without receiving feedback from a third party.

"About a week later, the Department reported that mother still required supervision while feeding the minor, and father had not been cleared to do the feedings by himself. Feedings were scheduled every three hours and lasted 30 minutes each, which meant that feedings would have to be monitored all day and all night. Father's Regional Center provider, Birth & Family Services, indicated that it was authorized to provide only 60 hours of parenting support and therefore could not provide 24-hour monitoring. The juvenile court ordered the Department to find a medical placement that would allow the parents to feed the minor on a daily basis. In addition, the Department was ordered to prepare a report addressing how the minor was doing medically, and whether he could be returned to the parents' custody. The minor was placed in a facility called CASA III in the City of Upland, which was 57 miles from the parents' home and difficult for them to visit. A few weeks later, the juvenile court ordered the Department to make all efforts to place the minor closer to the parents' home, and to provide the parents with transportation assistance. The Department was given the discretion to place the minor in a facility closer to the parents, or to release the minor to the parents' custody. The parents were granted unmonitored visitation with a 'reasonable visitation schedule.'

"The Department provided mother and father with transportation funds. However, they did not consistently visit the minor because, they claimed, mother did not feel well and father could not travel without her.

"As of August 15, 2012, mother completed the necessary training to feed the minor without difficulty or supervision. Father received training on four dates in September . . . 2012 but still required supervision during feedings. They completed a 16-hour parenting program.

"Both parents were assessed at Kedren Acute Psychiatric Facility [(Kedren)]. Father did not meet agency criteria for treatment. As for mother, a last minute information for the court indicated that she had been referred to the Coalition of Mental Health Professionals for parenting classes but did not provide proof of following up. An interim review report stated that medical records were silent as to whether mother was referred from mental health services. Medical staff informed a social worker that mother did not have Axis I symptoms and therefore did not meet their criteria. The Department obtained copies of past medical records indicating that mother had been previously diagnosed with Bipolar Disorder, depression and anxiety, had a history of visual and auditory hallucinations, and was hospitalized for psychiatric reasons in 2005. The medical records regarding father revealed that father had previously been diagnosed with chronic posttraumatic stress disorder, impulse control disorder and mood disorder as well as having a history of mild retardation.

"At a Team Decision Meeting on September 19, 2012, a safety plan was adopted. In addition, the parents and the Department developed a transitional plan that consisted of eight-hour day visits to the parents' home on Saturdays and Sundays. The Department recognized that 'mother and father have made great efforts to address the [minor's] medical condition.' But [the] Department concluded that the parents had 'not demonstrated the capacity to provide ongoing sufficient care to the child, as required by medical professionals.' Per the plan, grandmother would facilitate the minor's transportation.

"**The September 27, 2012, Disposition Hearing**

"At the continued disposition hearing DI Williams testified that though she did not know the current plan for the minor because that was handled by a service worker, the Department was concerned that the parents would not be able to feed and care for the minor on a continual basis. She testified that the parents completed a CPR and first aid class as well as a parenting class, and they had a sleep apnea monitor in their home. Counsel informed the juvenile court that the transitional plan developed at the Team Decision Meeting was not implemented because grandmother was not providing assistance. The juvenile court ordered unmonitored visits with both parents together until the next hearing.

"**The New Placement; Further Disposition Hearings; Intervening Developments**

"On October 2, 2012, the minor was moved to a medical facility in the City of La Puente called GE Pediatrics. The parents were given a monthly bus pass by the Department so that they could visit the minor. Also, if they called in advance, they could utilize the Access Paratransit program. SW Thomas spoke by phone with parent trainer Helen Dominguez (PT Dominguez) who confirmed that she was continuing to work with father. He asked for his services to be reassigned, but PT Dominguez said father had made the request when he was upset. She was approved to work with father for 40 hours per month. James Moore, father's assigned social worker from Regional Center, informed SW Thomas that father's support hours could be increased when the minor returned home.

"When the parties reconvened for the disposition hearing on October 10, 2012, mother testified, inter alia, that the minor had been diagnosed with Charge syndrome (which is accompanied by various symptoms) and Laryngospasms. She completed medical training regarding feeding and administering medication. The family was working with Para Los Ninos, a youth development service, as well as Birth [&] Family Services, the Nurse Partnership Program and other programs. She did not have a cell phone or a landline but expected to activate a new cell phone after the hearing. The juvenile court ordered the parents to have unsupervised weekend visits.

13

"During the weekend visit from October 12, 2012, to October 14, 2012, the parents failed to give the minor his medication as directed.  When he was returned to GE Pediatrics, his heart rate was fast and his apnea monitor went off three times.  He had to be watched all night.  For the weekend visit of October 19, 2012, to October 21, 2012, the parents were supposed to return the minor at 6:00 p.m. the final night so he could receive his 6:00 p.m. medication.  The parents did not return the minor to GE Pediatrics until 8:50 p.m.

"On October 24, 2012, at a continued disposition hearing, the juvenile court ordered that visitation to be increased to four days per visit for a trial period of two weekends.

"**The Events of November 2012**

"During a visit in early November, the parents took the minor to Huntington Memorial Hospital.  The medical staff told mother that minor had a cold and to bulb suction his nose.  Later, when his apnea monitor kept going off, the parents took the minor to Children's Hospital Los Angeles where he was admitted for what turned out to be an extended stay.

"When SW Thomas spoke to the attending doctor, Dr. Lily, she expressed a multitude of concerns about the parents, including the following:  they were not happy with the G-tube; mother threatened to remove the G-tube; mother had not been forthcoming about the minor; the parents continually reported that the medical staff failed to communicate with them regarding the minor's care; the parents videotaped medical personnel without their consent; mother was unwilling or unable to utilize nursing staff to resolve care issues and instead repeatedly had the attending doctor paged to address concerns; the parents were argumentative regarding the minor's care; and the parents failed to provide accurate dates for the minor's previous treatment.  At one point, the medical staff clamped the G-tube.  When Dr. Lily checked later, the clamps had been removed.  Both the parents and the medical staff denied removing the clamps.  According to the attending doctor, the parents falsely reported that the minor had diarrhea and was vomiting.  Though mother had been told that only nurses were supposed to feed the

14

minor, mother fed the minor anyway. Then she falsely told nurses she fed the minor one ounce of formula instead of six ounces. That may have resulted in overfeeding. Because they demanded so much attention, the attending doctor had not been able to attend to other patients. Dr. Lily viewed the parents as adversarial to the hospital, and did not want to leave them alone with the minor.

"On November 8, 2012, the [D]epartment filed an ex parte application under section 385 requesting that all visitation be monitored, and that the minor be placed in foster care after discharge from the hospital. The juvenile court granted the ex parte application. It appointed Michael P. Ward, Ph.D. to conduct psychological examinations of the parents.

"When a social worker from GE Pediatrics went to pick up the minor for discharge, his apnea monitor was missing. The social worker believed that the parents took it. The minor's social worker inquired with the parents. They denied taking the apnea monitor.

"The parents frequently had nonworking telephone numbers. Dr. Ward was initially unable to contact the parents to set up examinations." (*In re P.W., supra,* B247824, pp. 2–15.)

**The Parents' 72-Hour Psychiatric Holds**

On December 17, 2012, mother went to a hospital with father and complained of having suicidal thoughts with plans to run in front of a bus. The report from the hospital stated: "'Patient admits hearing voices but states, "I don't know what the voices are saying."'"

The initial psychiatric assessment note stated that mother was "'paranoid and said she only wanted to talk to the doctor. MD had to give patient injection. Patient was unwilling to give her cell phone to staff members and said[,] "I know you lesbians want to see me naked."'"

Mother and father were placed on psychiatric holds from December 17, 2012, to December 20, 2012. Due to these holds, they missed a family preservation meeting. Father was discharged with medication. (*In re P.W., supra,* B247824, p. 15.)

15

When SW Thomas asked the parents about their psychiatric holds, they claimed that they did not have any memory of them. Mother said she was hospitalized for anemia and asthma. (*In re P.W., supra,* B247824, pp. 11, 15.)

"**The Parents' January 5, 2013, Psychological Examination**

"Dr. Ward examined the parents and concluded that though they had 'problems, limitations and deficiencies,' they 'clearly have the capacity . . . will and motivation to adequately raise a child.' He stated that 'the people I saw in my office appeared to be fairly stable, reasonable, and quite workable. So unless there are some clear data that they are a risk or danger to their child and/or unless the child's medical condition and resulting needs are clearly beyond their capabilities to adequately care for him, then I would suggest [that minor and parents] need and deserve a chance at reunification. Of course, it should be done with all the care, caution and supervision necessary, and they need support to understand that. But it is perhaps time for them and the system to work together towards an agreed upon goal.'

"**The Minor's January 24, 2013, Hospitalization**

"The minor was taken to Childrens' Hospital Los Angeles on January 24, 2013, due to a brief period of [Cyanosis] (blue lips). He was admitted because of respiratory distress. To assist with breathing, the minor was placed on a Bi-Pap machine. On February 6, 2013, the Department reported that the minor continued to be medically fragile and have medical complications. There was a possibility that he would need a tracheotomy, which would dictate a higher level of care. The parents visited the minor only one time when he was in the hospital.

"**Multiple Disposition Hearings in February 2013**

"The juvenile court held a continued disposition hearing over the course of multiple days and heard additional testimony. SW Thomas testified that at the time of the hearing, the minor was hospitalized. His current medical conditions were 'Charge association, chronic lung disease, laryngomalacia.' He no longer needed a G-tube for feedings or to receive medication. But once he was discharged, he would continue to need the Bi-Pap machine. According to SW Thomas, mother and father still denied their

16

psychiatric hospitalizations.  When SW Thomas asked them to sign medical releases, father refused, and mother said she would 'think about it.'  SW Thomas did not know what the minor's discharge instructions would be.

"Case worker Lorena Hernandez (CW Hernandez) from Quality of Life Services testified that her agency provided the parents with parenting skills and assisted them during five or six visitations with the minor.  According to CW Hernandez, the parents were 'hands on' during visits and they complied with the rules of the medical placement. She described their willingness to work with her as 'very compliant.'  The parents notified her of their 72-hour psychiatric holds.  She knew that they did not inform SW Thomas, and that caused her concern.  The program director of Quality of Life Services, Lisa Fulton (Fulton) testified that the parents told her that they had been informed by SW Thomas that they need to get 'another psyche eval,' so they went to the hospital because that was the best means for them to comply.  Fulton knew that the parents were not comfortable sharing it with SW Thomas because of trust issues.  They believed that anything they said to SW Thomas was typically twisted and manipulated. Mother told Fulton that the parents were hospitalized because some of mother's behaviors were misconstrued.  Fulton was asked if mother ever disclosed that she had scheduled a psychological examination through the juvenile court system with Dr. Ward. Fulton replied:  'I don't believe she did.'  She was not aware that Dr. Ward actually did an examination.  If the juvenile court returned the minor to the parents' custody, Fulton said she 'would do an addendum for additional parenting hours' even if that meant 'around the clock services[.]'

"Abby Arguilla, an employee at GE Pediatrics, testified that the minor was discharged from the hospital after a three week stay.  She said that the parents needed training on the Bi-Pap machine.  They also needed training on how to feed the minor by mouth.

"Mother testified that she was placed on a psychiatric hold after she went to the hospital because she was 'stressed' and asked for a psychiatric evaluation.  She told the medical staff that she did not feel good.  She did not tell SW Thomas because she did not

think it had anything to do with the minor's care, and because she did not trust him. According to mother, SW Thomas had changed statements in the Departments reports 'to go against [her].' Mother conceded that she did not sign a medical release for the minor's social worker. Initially, mother said she had not been trained on a Bi-Pap machine. Later, she said that both father and she received training for 10 or 20 minutes from someone at GE Pediatrics, but that person [had] not sign[ed] a confirmation for the social worker.

"After hearing argument, the juvenile court stated, inter alia: 'The court has considered the reports from July 3rd, 2012, through and including the September 27, 2012, report. I reviewed Dr. Ward's report of January 2013. What concerns me is that, as [the Department's attorney] indicated, the parents were not forthcoming to [SW Thomas]. . . . The problem with that is that then the information does not filter to the court. The court has to make . . . decisions based on all of the information that is presented to it. If the information is flawed, the court cannot make an intelligent or appropriate decision. [¶] Notwithstanding the parents' perhaps valid distrust of [SW Thomas] or all of the system, they weren't forthcoming with Ms. Fulton either, and that's [what] causes me greater concern. The mother indicated that she and the father were not trained on the [Bi-Pap] machine. Then she indicated a little bit later in the testimony today that she was. . . . [¶] The problem with the trust issue is that it caused a significant misrepresentation. The parents went to a psychiatric hospital and were not allowed to leave on their own accord, and I still [do] not know exactly why they were there. [¶] I still do not know what their exact mental functioning is as a result of the hospitalization. We are not talking about a developmentally normal child in this case. I have a very fragile, special needs child, and the court has to take that into consideration as well. [¶] As a result, . . . [¶] . . . I am declaring [the minor] to be a dependent child of the court under section 300[, subdivision] (b) only. [¶] By clear and convincing evidence, his care, custody, and control is taken from the parents and committed to the care, custody, and control of the [Department]. [¶] I am ordering reunification services for both parents. [¶] I am ordering both parents to finish a parent education class. . . .' Next, the

18

juvenile court ordered the parents go to individual counseling to address the case issues and to be evaluated by a psychiatrist to see if they need medication. The parents were granted "ongoing monitored visits." The juvenile court ordered them to sign 'HIPPA medical release forms.'" (*In re P.W., supra,* B247824, pp. 15–18.)

**The May 4, 2013, Psychological Report**

Mother and father were evaluated by Alicia Bales M.D. of the USC Institute of Psychiatry and Law. She diagnosed mother with Adjustment Disorder and Mood Order Not Otherwise Specified. Based on mother's history, Dr. Bales discounted the possibility that mother had a primary psychotic disorder and opined that bipolar disorder could not be diagnosed or ruled out.[6] Dr. Bales diagnosed father with Adjustment Disorder and Mild Mental Retardation.[7] The recommended treatment for both mother and father was

---

[6]  As revealed to Dr. Bales by mother and her medical records, she was raised by an abusive parent who had been diagnosed with bipolar disorder. Kedren documented that mother began to hear voices at age six and have visual hallucinations. Eventually, mother was removed from her home and placed in foster care. When she was 15, she was hospitalized for suicidal ideation, though she later claimed it was a ruse for her foster family to obtain a greater amount of public assistance by having a foster child who was mentally ill. At age 18, mother was once again admitted into a psychiatric hospital. She was placed on Seroquel, an anti-psychotic and mood stabilizer, which made her drowsy. After she reported weight gain and problems with a racing heart, her physician discontinued the Seroquel and placed her on Abilify, another antipsychotic and mood stabilizer. Mother stopped taking the medication on her own because she did not perceive a benefit. At that point, a doctor place her on Resperidone, another antipsychotic and mood stabilizer. Social Security provided mother with benefits because she had borderline intellectual functioning.

[7]  Father's history revealed the following. Growing up, he had a history of auditory and visual hallucinations. At age nine, he tried to kill himself twice and was hospitalized. Three years later, while he was in foster care, he was hospitalized again. According to father, his foster mother wanted more public assistance and accused him of trying to set her house on fire. At the time, he went along with the story. From ages 11 to 14, he was placed on various medications that he did not like. Available medical records indicated that he had been prescribed Wellbutrin and Respirdone. In 2003, he was diagnosed with posttraumatic stress syndrome and major depression disorder with psychotic features. (*In re P.W., supra,* B247824, p. 5.)

19

psychotherapy. In addition, Dr. Bales concluded that mother and father would benefit from a program that would provide a liaison to help them interact with providers.

**The August 22, 2013, Status Review Report**

The Department reported that the parents were in partial compliance with the court-ordered case plan. They had completed a 16-hour parenting program. They were allowed to visit the minor every day at his placement. From March to August 19, 2013, they visited the minor in his placement only 11 times. During that same time frame, they saw the minor 10 days when they accompanied him to medical appointments.

The case was transferred to Social Worker Jose Agredano (SW Agredano) on July 23, 2013. SW Thomas, however, still remained involved.

According to the Department, SW Thomas met with the parents on April 11, 2013, and provided them with referrals for court-ordered programs. A few weeks later, mother requested a referral to Shields for Families, and SW Thomas provided it. On May 7, 2013, SW Thomas met with the parents and they stated that they had not enrolled in individual therapy. A month later, without notice, the parents failed to attend an appointment with SW Thomas at the Department's office. On June 25, 2013, a different social worker met with the parents and a relative. The parents stated that they did not enroll in therapy "because they were told that they did not need to do so." However, on July 11, 2013, mother informed the Department that she was enrolled in therapy at Kedren and provided a phone number. Four days later, mother identified her therapist as "Gabby" and said that she had enrolled in April, which was the soonest that Kedren would allow. SW Thomas asked why mother had not informed him sooner, and mother stated that she could not get in touch with SW Thomas. He reminded her that they had met with him and other social workers since April, and he had voicemail. According to father, he did not know the identity of his assigned therapist. Mother said father had not been assigned a therapist. When SW Thomas asked the parents about their attendance in therapy, the parents said they had conflicts with the minor's medical appointments, which caused them to miss therapy appointments. Mother indicated that she went to therapy

20

every three weeks, and that she could not be seen on a more frequent basis. Though she went for walk-in appointments, she was often not seen on those days.

SW Thomas asked the parents about psychiatric care. Father stated that he believed he saw a therapist named Salazar one time and was told he did not need a psychiatric referral. Mother said she was twice scheduled to see a psychiatrist named Dr. Gillman, but she missed both appointments.

On July 22, 2013, SW Thomas called Kedren and spoke to Gabby Grijalva (Grijalva). She stated that she did not have medical releases signed by the parents. He faxed releases to Grijalva. He asked for written progress reports, and for information regarding the parents' dates of enrollment and dates of attendance. He then left voicemails for Grijalva on three subsequent dates. She left voicemail messages for SW Thomas on four dates but did not provide any requested information. On August 15, 2013, SW Thomas spoke to Jose Reyes at Kedren. He was unable to confirm any information about the parents because they had not signed releases. Finally, on August 16, 2013, Grijalva sent SW Thomas a progress letter stating that mother had missed her medical evaluation by Dr. Elena Gilman on April 15, 2013 and July 9, 2013. It was Kedren's policy to have their clients assessed by a psychiatrist. Nonetheless, mother stated that she did not want to schedule a third appointment with a psychiatrist because, in her opinion, she did not need a psychiatrist. Grijalva said she saw mother on a monthly basis, but that mother's attendance was inconsistent. It was Grijalva's recommendation that mother attend her appointments on a consistent basis. Grijalva reported a concern that mother seemed unable to take care of her own medical issues, which could indicate a problem with her ability to address the minor's medical issues. Though Kedren could schedule only one appointment a month, Grijalva opined that mother needed more therapy, and that mother should "drop in" to Kedren "more often" for walk-in appointments.

On August 20, 2013, SW Thomas learned that Najam Mashadi (Mashadi) had been assigned as father's therapist. SW Thomas left the therapist a message, requesting a return call. By the time the August 22, 2013, status review report was prepared, Mashadi

had not returned SW Thomas's call.  Thus, SW Thomas was unable to confirm father's participation in therapy.

Based on mother's inconsistent attendance at therapy and the lack of confirmation regarding father's therapy, the Department concluded that the minor's "risk of future abuse and/or neglect is high."

**The November 4, 2013, Addendum Report**

According to the Department, the parents were seen for three therapy sessions at Crystal Hope Medical Services.  Subsequently, they began therapeutic sessions with the Multi-Service Family Center.  Mother continued to take part in additional therapy sessions at Kedren with Grijalva.  SW Agredano contacted the Multi-Service Family Center to obtain information about the parents' therapy but was told he first needed a release from the parents.  The releases were sent to Lacresha Pree (Pree) so she could assist the parents with signing the forms.

Grijalva reported that she had been seeing mother for treatment of Depressive Order NOS since March 18, 2013.  Treatment focused on reducing symptoms of depression, irritability, stress management, and developing effective coping skills.  She attended appointments on June 7, June 13, July 17, July 30, August 13 and September 13, 2013.  However, she missed appointments on June 24, July 1, July 9, September 11 and September 27, 2013.

The Department decided to liberalize visitations to begin with two-hour unmonitored day visits.  It planned to eventually allow overnight visitation as the parents progressed in therapy.

**The Contested Six-Month Review Hearing**

For the hearing, the juvenile court stated that it had reviewed "the reports, beginning with August 22nd of 2013 through November 4 of 2013."

SW Agredano rather than SW Thomas was called to testify and stated that the parents had completed parenting classes and were going to individual counseling.  They went to Crystal Hope for four sessions, and then to the Multi-Family Service Center for another four sessions.  Separately, mother was seeing a therapist at Kedren.  The parents

22

stopped going to Crystal Hope because they did not have licensed therapists. When asked if he had any concerns about returning the minor to the parents, SW Agredano stated: "Well, at this point, . . . just having more . . . ongoing therapeutic services." In his view, therapeutic consistency "would allow the therapist to assess the parents' mental health needs which would assist [them] in caring for the child due to the fact that they have had previous psychiatric evaluations and even been on psychiatric hospitalization holds. So with an ongoing therapist continuing to see the family, maybe we would be able to better gauge their mental health needs once they have their child[.]"

At the time of the hearing, SW Agredano believed that the minor was on oxygen 24 hours a day due to his chronic lung disease but no longer had the G-tube. SW Agredano understood that the parents were receiving services from Pree and her agency. Pree provided the parents with assistance for such things as hygiene, transportation, housekeeping and money management. The Department decided to allow two-hour, unmonitored visits because the parents were in partial compliance with the case plan. At no point did SW Agredano provide the parents with referrals for therapy, and he was unaware that the parents had trouble obtaining therapy. When asked if he provided father with referrals in light of his Regional Center services, SW Agredano answered: "No. I have not provided [father]—since I have other cases, I have not provided [the parents] with referrals in regards to the therapy."

SW Agredano did not know whether mother's therapy was dealing with adjustment disorder, mood disorder or bipolar disorder, or whether the therapist was aware of mother's hospitalization. He had not followed up with the therapist to find out how mother was progressing. As a result, he did not know if mother was suicidal.

Pree testified next. She was the parents' counselor at Quality Life Services, an independent living agency, and had been working specifically with father for six months. He was entitled to 50 hours of services each month, which could be increased if he needed it. Pree was available 24 hours a day. The parents met with Pree three or four times a week. Each of those meetings lasted about five hours. Pree transported the parents to their visits with the minor and monitored the visits.

23

In Pree's opinion, the minor's health was "doing better." According to his doctors, he did not need oxygen 24 hours a day if someone was watching him. Pree had observed the minor without his oxygen while at the medical placement and at his doctor's office. Though she had seen the parents give the minor oxygen, she had not seen them provide the minor with medication. The parents have food, clothes and a crib for the minor. Pree helped them make their home safe for a child by putting covers on the sockets and placing cleaning products out of where a child could reach. The minor was scheduled to have a surgery that would solve his breathing problems and eliminate the need to give him oxygen. The parents had consented to the surgery. Pree had no concerns about the parents having custody of the minor. She believed that the parents went to the hospital in December 2012 due to depression because they did not have custody of the minor during the holidays.

When asked if father could function without assistance, Pree said that he could. Nonetheless, she also said that the services he was receiving would continue for the rest of his life.

Next, Fulton was called. She testified that she had been working with the family through Quality of Life for a year. They met once or twice a week and discussed the dependency case, parenting skills, and life skills. She was asked if she had any concerns about them being able to parent the minor and said, "None whatsoever." She perceived father as "[v]ery high functioning" and said that mother was "as bright as anyone I have ever met." Mother had told Fulton that she went to the hospital in December 2012 for depression, and because SW Thomas wanted her and the minor to obtain psychological evaluations. In addition, mother told Fulton that her behavior at the hospital was misinterpreted after the medical staff thought she was trying to hurt herself when she plugged in her cell phone. Mother did not tell Fulton that she was having suicidal ideation, and Fulton was not aware that mother had claimed to be hearing voices. Moreover, Fulton had not seen the parent's psychological evaluations.

After oral argument, the juvenile court stated: "I think what concerns this court the most is the information that's being provided is incorrect. I'm asked to trust what's

24

being presented to me[,] . . . but I can't at this point be able to trust [t]hat the parents have benefited from counseling because there's been no evidence presented that they have benefited from any of this counseling. They haven't gone on a consistent basis to tell me what they have learned, what they need to learn from the counseling. [¶] . . . Today I have these care providers coming back to court still not really knowing what the parents were hospitalized for, and what they told the care providers is significantly different [than the reason] . . . they were hospitalized. . . . [¶] The court is being asked to send . . . a medically fragile child that needs oxygen, that needs a lot of extra care to people that can't quite tell us what is going on, what is accurate and not accurate. I am at a loss to know how counsel can expect me to send this child home with the little information that I have. [¶] The changes of therapy [do] not assist any of us, and I understand it might not be the parents' fault, but I don't have any way of knowing that anyone has benefited in this case. We are back where we pretty much started, and I am frustrated, frankly. [¶] The court is at this time in agreement with the Department. I also agree . . . that ultimately I need to be able to send [the minor] home. That's the goal here, but I can't do it safely with the information that's been presented to me[.]" The juvenile court stated that the conditions necessitating its intervention continued, and that reasonable services had been provided.

The parents were granted unmonitored visits three times a week for two hours. After three weeks, they were to receive visits lasting four hours. After six weeks, the visits would last all day. The Department was given the discretion to liberalize visits to overnights and weekends. Also, the Department was given the discretion to release the minor to the parents' custody. Finally, it was ordered to continue providing reunification services. The permanency planning hearing was set for January 14, 2014.

These timely appeals followed.

## DISCUSSION

### I. The Risk of Detriment Finding.

The parents contend that the Department failed to prove that returning the minor to their custody posed a substantial risk of detriment. As a corollary, the parents argue that

25

the juvenile court misallocated the burden of proof by requiring them to prove that they had benefited from therapy.

We disagree.

A. <u>Standard of review</u>.

Appellate courts review a "finding of substantial risk of detriment for substantial evidence, which means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.] In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody. [Citation.]' [Citation.]" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.) When a dependency statute does not mandate explicit findings and substantial evidence supports the juvenile court's order, findings may be implied. (*In re Corienna G.* (1989) 213 Cal.App.3d 73, 83; *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554.)

B. <u>The applicable law</u>.

At the six-month review, the juvenile court shall order the return of a child to the physical custody of his parent unless it finds, by a preponderance of the evidence, that the return of the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.21, subd. (e).) The statute goes on to provide that the social worker has the burden of proof. (*Ibid.*) But it also provides that "[t]he failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) When making its determination, a juvenile court "shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself to services provided[.]" (§ 366.21, subd. (e).)

26

C.  Analysis.

The question is whether the record contained prima facie evidence of a risk of detriment because the parents failed to participate regularly in court-ordered treatment programs and make substantive progress.

The answer is yes.

In February 2013, the juvenile court ordered the parents into counseling so they could resolve their case related problems, which involved the failure or inability to provide the minor consistent and proper care.  Prior to the six-month review hearing in November 2013, mother had gone to only six therapy sessions with Grijalva while missing five.  The record establishes that father did not go to therapy until sometime in August 2013 or after.  Mother and father went to four therapy sessions at Crystal Hope, and then they went to four therapy sessions at Multi-Family Service Center.  In other words, in about 10 months, they had only eight sessions with those agencies.  Thus, the evidence established that the parents did not participate regularly in court-ordered treatment.  Over the last year of the case, the parents did not move past monitored visitation and never applied what they had learned in therapy during extended, unmonitored visits with the minor.  As a result, they did not make substantive progress in their treatment.  When it comes to parenting, progress must be measured in terms that are practical rather than theoretical.

The juvenile court did not expressly find that there was prima facie evidence of a risk of detriment.  But that finding is implied.

## II.  The Reasonable Services Finding.

The parents contend that the record does not support the juvenile court's finding that they were provided with reasonable services.  In particular, they contend that even though the case plan required them to attend individual counseling to discuss case-related issues, it was inadequate because it did not direct them to see licensed counselors or licensed therapists, and it did not inform them how often they were supposed to go to counseling.  According to the parents, the lack of specificity in the case plan, and the Department's failure to reasonably fill in the gaps in the case plan, made it impossible for

27

the parents to demonstrate the progress in counseling that the juvenile court found lacking. Next, they contend that the Department failed to provide reasonable services because it did not make a sufficient effort to obtain and present evidence regarding the parents' progress in counseling.

These contentions lack merit.

A. Standard of review.

When reviewing a reasonable services finding, we ask only whether the finding was supported by substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

B. The applicable law.

For a child who was under three years of age at the time of initial removal, "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49, unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(A).) Under this statute, the Department must make a good faith effort to provide reasonable services responsive to the needs of the particular family. (*In re K.C.* (2012) 212 Cal.App.4th 323, 329.) In reviewing whether reunification services are reasonable, courts recognize that in most cases more services could have been provided, and that the services provided are often imperfect. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.) The standard is not whether they were perfect, but whether they were reasonable under the circumstances. (*Ibid.*) The third paragraph of section 366.21, subdivision (e) provides that if a juvenile court finds at the six-month review that reasonable services have not been provided, it "shall continue the case to the 12-month permanency hearing."

C. Analysis.

The record establishes that the Department provided reasonable services under the circumstances. In February 2013, the juvenile court ordered that parents go to individual counseling to address case issues. It also ordered them to sign medical release forms. In April 2013, SW Thomas met with the parents and gave them referrals for court-ordered

28

programs. Nonetheless, at meetings during the next couple of months, the parents reported that they had not enrolled in therapy. In July 2013, mother reported that she had been enrolled in therapy at Kedren with Grijalva but had not been able to inform SW Thomas. Her statement lacked credibility because she had ample opportunity to inform SW Thomas and other social workers. Thus, in the early going, she thwarted the ability of social workers to follow up with Grijalva. Father indicated that he had been assigned a therapist but did not know who it was, and mother said father had not been assigned a therapist at all. By late August 2013, SW Thomas learned that Mashadi had been assigned as father's therapist but could not confirm that father had been to therapy. In general, the Department was unable to confirm the parents' progress in therapy because they had not signed release forms, as ordered by the juvenile court. It was not until August 2013, some seven months after the parents had been ordered to go to counseling, that SW Thomas learned about mother's progress with Grijalva. By inference, Grijalva's report of mother's progress was incomplete because mother refused to be assessed by one of Kedren's psychiatrists.

SW Agredano attempted to learn about the parents' progress in therapy at the Multi-Service Family Center but encountered a roadblock because, once again, the parents had not signed medical release forms.

Though the parents impliedly argue that the case plan contained a de facto requirement that they see licensed therapists on a frequent basis for their therapy to count, and that somehow the Department was at fault for not informing the parents of this de facto requirement, that argument finds no support in the record. The licensure issue arose when Crystal Hope Medical Services determined, on its own, that it could not provide appropriate services to the parents because it did not have licensed therapists. It was Grijalva, not the juvenile court or the Department, who indicated that mother needed more consistent and frequent therapy. In general, the juvenile court and the Department required the parents to attend counseling but otherwise allowed mental health professionals to determine the details.

29

In sum, the Department offered reasonable counseling services in light of the parents' failure to communicate about the services or lack of services they were receiving, and their failure to sign medical release forms that would have allowed social workers to assess their additional needs, if any.

We reject the suggestion that any deficiencies in the Department's evidence at the six-month review hearing constitute a failure to provide reasonable services. The parents cited no case law establishing that the Department's obligation to provide reasonable services includes an obligation to present evidence at a hearing. And even if such case law existed, it would not aid the parents' cause. Here, they bear the brunt of the responsibility for their case-related shortcomings because of their lack of communication about and participation in therapy.

Even if there was error, it was harmless. When a juvenile court conducts a six-month review hearing and finds a lack of reasonable services, the remedy is to continue the matter to the permanency planning hearing. Here, the juvenile court extended reunification services and set the permanency planning hearing for January 14, 2014. As a consequence, the parents have not been prejudiced by the juvenile court finding that reasonable services were provided.

**DISPOSITION**

The juvenile court's orders and findings are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, Acting P. J.
        ASHMANN-GERST

We concur:

_____, J.
        CHAVEZ

_____, J.*
        FERNS

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.