Filed 3/20/25  A.G. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| A.G.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G065023<br><br>(Super. Ct. No. 24DP0372)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Petition granted. Motion to augment granted.

Martin Schwarz, Public Defender, Richard Cheung and Brian Okamoto, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Real Party in Interest, Orange County Social Services Agency.

No appearance for Real Party in Interest, the Minor.

\*          \*          \*

A.G. (Mother) seeks extraordinary writ relief after the juvenile court terminated her reunification services as to her child A.R. (the minor) at the six-month review hearing and scheduled a selection and implementation hearing. (Cal. Rules of Court, rule 8.452.)[1] Prior to taking these actions, the court found Mother was provided reasonable services. Mother argues the court's finding is not supported by substantial evidence and the court therefore erroneously terminated family reunification services and scheduled a hearing pursuant to Welfare and Institutions Code section 366.26.[2] Mother speaks Tagalog and has limited English proficiency. She contends certain services ordered in her case plan were inaccessible to her because of a "language barrier" and a foundational cognitive evaluation that was ordered pursuant to section 730 of the Evidence Code (730 evaluation) never took place.

The Orange County Social Services Agency (the Agency), real party in interest, filed an opposition to Mother's petition. The Agency contends the juvenile court's finding is supported by substantial evidence and

---

[1] The minor's father (Father) is not a party in this writ proceeding.

[2] All undesignated statutory references are to the Welfare and Institutions Code.

2

the order terminating reunification services and setting a section 366.26 hearing should stand. The Agency asserts Mother made no efforts to ameliorate the issues that brought about these child welfare proceedings and her failure to participate in her case plan was due to disinterest, not the result of a language barrier.

We acknowledge the difficulties the Agency and the juvenile court faced in this case. Mother vacillated between being cooperative and recalcitrant during the reunification stage. However, as we explain below, we conclude the court's finding reasonable services were provided or offered to Mother is not supported by substantial evidence, and we grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Agency's Involvement with the Family*

The Agency became involved with the parents in April 2023 upon the death of their one-month-old child, U.R. Father called emergency services after finding U.R. unresponsive, and U.R. was pronounced dead at the hospital. The parents provided varying accounts concerning the circumstances surrounding U.R.'s death, relating to when he was last fed and whether he was placed on his stomach in his bassinet. The coroner's report showed U.R. had a low level of methamphetamine in his system, indicating exposure or transfer through breast milk, but it was not the cause of U.R.'s death. There were no signs of trauma noted on the autopsy report, and the cause of death was listed as undetermined. The parents were interviewed several months after U.R.'s death and admitted Mother used methamphetamine during the time she was breastfeeding U.R.

3

In January 2024, the Agency conducted an investigation concerning the parents and their ability to care for P.R., their other child.[3] P.R. was seven years old with neurodevelopmental disorders, as well as speech and language issues, and was experiencing developmental delays. She had been referred to the Center for Autism and to a neurologist, but her parents failed to follow through with her needed medical appointments and they did not attend P.R.'s individualized education plan meetings at school.

During the Agency's investigation, Mother shared she was pregnant. She admitted recent use of methamphetamine during the pregnancy and denied obtaining prenatal care. Both parents reported Father buys methamphetamine for Mother, but he denied purchasing it for her recently. He declined to take a drug test, stating he would test positive for cannabis.

P.R. was removed from the parents' care due to neglect. The juvenile court declared P.R. a dependent child and ordered family reunification services for the parents.[4] As part of her reunification services in P.R.'s case, Mother was referred for random drug testing in February, but she was not compliant and was not engaging in substance abuse treatment.

---

[3] Subsequent dates are in 2024 unless otherwise stated.

[4] We grant the Agency's motion to augment the record in this appeal with the record in the appeal concerning P.R. (case No. G064799) and with the documents specified in the motion that were filed in the juvenile court in P.R.'s case (Orange County Superior Court case No. 24DP0081). (Cal. Rules of Court, rules 8.155(a)(1)(A), 8.410(b)(1), and 8.452(e)(2).)

*B. Detention and Petition*

When the minor was born in March, both she and Mother tested positive for amphetamines. The minor had a cleft palate and was placed in the neonatal intensive care unit due to respiratory distress.

An Agency social worker interviewed both parents the day of the minor's birth and spoke to Mother with the assistance of a Tagalog interpreter. Mother was cooperative. She denied drug usage during her pregnancy or in the past. Father also denied Mother used substances during her pregnancy. He acknowledged she had a prior history of drug usage but claimed she had been sober for two years. These statements were inconsistent with statements the parents made just two months prior, admitting Mother's drug usage. The social worker reported it seemed Father was answering for Mother when she spoke to the parents. At times, when the interpreter attempted to speak, Father cut off the interpreter and said something to him in Tagalog.

A nurse was concerned Mother was being trafficked as Father appeared controlling and talked for Mother, who looked to Father prior to answering questions. The nurse reported Mother "ha[d] childlike behavior such as covering her face when someone [was] talking to her." Another nurse at the hospital reported Mother seemed irritable and was scratching her skin when awake but slept a lot. However, in their interactions with the minor, the parents seemed "'caring, appropriate and [Mother was] hands on with the newborn.'"

The day after the minor's birth, the juvenile court granted the Agency's request for a protective custody warrant for the minor.

The detention report discussed the Agency's prior involvement with the family and concerns Mother would continue to engage in substance

use while caring for the minor. The report also indicated Mother may have undiagnosed or untreated mental health or cognitive issues. The report noted Mother had difficulty answering questions and Father would answer for her. The juvenile court ordered the minor detained from both parents but granted the parents visitation with the minor, who remained in the hospital. The court ordered the Agency to prepare a case plan and to provide reunification services.

*C. Jurisdiction and Disposition*

The Agency filed a petition alleging failure to protect the minor, failure to provide for, and inability to provide care due to mental illness, developmental disability, or substance abuse (§ 300, subd. (b)(1)) and sibling neglect (*id.*, subd. (j)). At the jurisdiction hearing on April 10, factual allegations in the petition were amended and the parents pled no contest to the amended petition. The juvenile court found the amended allegations true by a preponderance of the evidence and declared the minor a dependent of the court.

The court vested custody of the minor, who remained in the hospital due to complicated medical issues, with the Agency for suitable placement. The court ordered family reunification services and for Mother to undergo a 730 evaluation to assess for cognitive impairments and/or learning disabilities. The court authorized funding for the evaluation and for a Tagalog interpreter to assist the appointed expert with the evaluation.

As part of her case plan, Mother was to attend and participate in parent education and counseling, enroll and participate in a substance abuse treatment program, attend at least two self-help meetings a week, and submit to random drug testing. Mother was advised by her counsel, on the record, the Agency was recommending family reunification services, which

meant she was "going to be asked to participate in services like counseling and drug-testing and substance-abuse treatment" to reunify with the minor. Mother indicated she wished to participate in the family reunification program she had discussed with her counsel. Mother's counsel alerted the court Mother would need a Tagalog interpreter or Tagalog-speaking service provider for her services. The court granted the request "with respect to making sure that there's the appropriate person to assist in the translation for Mother as she goes through this process." The court set a progress review hearing for June and a six-month review hearing for October.

*D. The 730 Evaluation*

On April 12, a couple of days after the disposition hearing, a psychologist was appointed to evaluate Mother for potential cognitive or developmental delays, to address the presence of developmental disabilities or psychiatric dysfunctions that would interfere with her parenting capacity, to address the extent of her substance abuse and its effect on her parental capacity, and to recommend treatment and accommodations, if any, needed for her in completing her case plan. About five weeks later, the psychologist informed the court, in a letter, the 730 evaluation had not been completed because Mother had not responded to the psychologist's several attempts to schedule the evaluation. The psychologist requested to be relieved of the appointment.

At the progress review hearing on June 4, the juvenile court appointed a new expert to complete the 730 evaluation of Mother and authorized funding for the evaluation and a Tagalog interpreter to assist in the evaluation. Two days later, the court appointed a different expert, Dr. Ted Greenzang, to perform the evaluation. On June 10, the Agency social worker attempted to e-mail information to Greenzang's office regarding the

7

appointment, but electronic delivery failed. On June 13, the social worker left a message with Greenzang's office requesting a return call regarding where to send documents relating to the evaluation. A minute order dated July 5, reiterated the court's order Language Access Services (LAS) provide a Tagalog interpreter to assist in the completion of the 730 evaluation. On July 9, the social worker spoke to someone at Greenzang's office and obtained an e-mail address to send information for Mother's evaluation. The social worker requested Greenzang's office contact Mother for the evaluation. The employee indicated they had received the court's minute order and were working on obtaining an interpreter.

*E. Reunification Period*

In May, the minor was released from the hospital and placed with a caregiver. The minor had multiple health issues and was considered "medical-fragile." She was placed in a home different from P.R. because P.R.'s caregivers were unable to meet the minor's medical and developmental needs. In July and September, the court authorized surgeries for the minor, including surgery to repair congenital heart defects.

For several weeks in April and May, the parents were inconsistent in their communication with senior social worker Carmina Sandoval, who was assigned to the minor's case after the case plan was adopted at the jurisdiction and disposition hearing. Sandoval made multiple attempts to contact the parents but was unable to connect with them to review the case plan. She attempted to contact Mother using a Tagalog interpreter and left voicemails on Mother's phone requesting a return call to review the case plan. The Agency sent to Mother an "unable to contact letter" translated into Tagalog, which Father reported she received. The parents scheduled a monthly compliance visit but failed to attend.

Unable to get the parents to come to her, Sandoval went to them in June. She observed their visitation with the minor and met with them afterward to discuss their case plan. She used a Tagalog interpreter when talking to Mother. Sandoval reviewed with them the case plan, referrals to counseling, and parent education services. Father declined to sign the referrals or to participate in his case plan services. He indicated he would contact his attorney to discuss his services before signing any paperwork. Mother stated she agreed with Father. She declined to participate in the case plan services, including the 730 evaluation, or to sign the referral form until she spoke to her attorney. The parents, however, agreed to take a copy of the case plan. Sandoval provided the parents with information concerning the minor's medical condition and future medical appointments, which she encouraged them to attend.

In August, Sandoval contacted the parents during an unannounced visit to their residence as they did not show up for their scheduled meetings. Sandoval met with Mother separately, assisted by a Tagalog interpreter, and went over the case plan with Mother. Mother signed her case plan, as well as the referrals for counseling and parent education. Sandoval provided Mother with Greenzang's contact information for the 730 evaluation, and Mother gave "a verbal agreement." After Mother stated she had not enrolled in an outpatient substance abuse treatment program, Sandoval offered treatment program resources. Mother indicated she was staying sober. However, she was not calling in for drug testing. Sandoval supplied Mother with attendance cards for self-help meetings. As for visitation, Sandoval encouraged Mother to use public transportation to visit the minor and not depend on Father for transportation. Mother understood and agreed. When Sandoval advised Mother to attend the minor's medical

9

appointments, Mother stated she was unaware she was allowed to do so and stated the caregiver informed her about the minor's medical appointments. Father continued to decline to participate in his case plan services.

*F. Six-month Review Report and Addendums*

In its six-month review report, the Agency recommended terminating reunification services and scheduling a selection and implementation hearing under section 366.26. The report stated Mother's cooperation with the case plan and her progress toward mitigating or alleviating the causes that necessitated the court's involvement were minimal. The report noted the parents had not made any progress on their court-ordered case plan services. Sandoval had to do unscheduled visits with the parents because it was difficult to get them to schedule their monthly compliance contacts and they did not show up for the ones scheduled. The parents were approved for eight hours of weekly supervised visits but never participated in their full allotment of weekly visits.

The Agency was concerned about the parents' extensive substance abuse history and whether the parents could provide the required care for the minor's medical and developmental needs. The parents had not demonstrated a willingness to participate in the minor's medical appointments, and the minor required care by primary and specialty providers for issues concerning cardiology, gastrointestinal, craniofacial, and cardiothoracic surgery. The minor was thriving in her placement, and her caretakers had expressed a willingness to provide permanency should reunification fail.

The Agency's review report noted two child abuse reports had been taken regarding the parents and sibling P.R. A social worker investigating the child abuse reports contacted the parents and offered

10

interpretation services, but the parents declined and stated their preferred language was English. The parents participated in the interview together. During the interview, Father declined to answer any further questions and stated they were "'going to plead the fifth.'" Mother agreed, and they ended the interview.

The six-month review hearing was continued to November and then December and addendum reports were filed each month. In both reports, the Agency's recommendation remained unchanged.

In November, Sandoval contacted the parents at their residence for a monthly compliance meeting. Mother declined the use of a Tagalog interpreter during the visit and stated she preferred to speak in English. Sandoval observed Mother to be fidgety and scratch various parts of her body and she had scars on her face. Sandoval provided the parents with the case plan, as well as a community resource packet, and reviewed the case plan with them. The parents stated they were not participating in the case plan services. When asked why they were not engaging in their case plan services and not attending the minor's medical appointments, Father stated he had been ill and Mother indicated she was afraid to use public transportation by herself.

During the in-person meeting, Mother stated she was staying sober. However, she had no call-in compliance for drug testing. Mother said she had not enrolled in an outpatient substance abuse treatment program, and Sandoval provided her "with outpatient substance abuse treatment program resources." Sandoval also gave Mother the contact information for Greenzang's office to complete the 730 evaluation. Mother provided "a verbal agreement." Mother indicated she had not attended self-help meetings.

Mother's referrals for counseling and parent education remained pending and Mother was near the top of the waitlist for these services on November 19. The providers also needed to check to see if they could accommodate Tagalog.

The parents were inconsistent with their visitation of the minor and did not attend her medical appointments.

Both addendum reports stated Mother's compliance with the case plan had been minimal. She had not completed counseling, parent education, a substance abuse treatment program, any substance abuse testing, attended self-help meetings, or undergone the 730 evaluation. There were concerns Mother continued to have unresolved mental health and substance use problems.

*G. Six-month Review Hearing*

A contested six-month review hearing took place over two days in December. The parents were in court for the first day of the hearing but failed to return for the proceedings the following day, even though they were ordered to return. The court admitted into evidence the Agency's six-month review and two addendum reports in the minor's case. At the Agency's request, the court took judicial notice of P.R.'s case.

At the six-month review hearing, Sandoval testified regarding her monthly compliance meetings with the parents. She made multiple attempts to meet with them in person in May but was unsuccessful. In June, she made a few attempts to meet with them in person and was able to do so by going to one of their visits with the minor. She observed the visit and spoke to them afterward. Her efforts to meet with them in July were unsuccessful, so she mailed a packet to them that included community resource information, their case plan, information for drug testing, "self-care

meeting cards," and her business card. The information in the community resource packet was in English, but Sandoval told Mother she could help her with the services if she needed it. Sandoval did not inquire whether there was a community resource packet in Tagalog that could be sent to Mother.

Unable to contact the parents in August, Sandoval conducted an unannounced visit to their home and spoke to them there. She made a few attempts to meet them in September and October, but her efforts were unsuccessful. In November, she again attempted to contact them to arrange a meeting. When she did not receive a response, she conducted an unannounced visit at their home and spoke with them. As of the December 17 hearing, Sandoval had not met with the parents in December; Mother was a no-show at a December meeting Sandoval had scheduled with her. Sandoval and the parents planned to meet after the hearing that day.

Other than her unannounced visits to the parents' residence and the meeting after their visitation with the minor, the parents did not meet with Sandoval in person. But they were responsive to her phone calls and text messages at various times during the case.

In August, Sandoval met with Mother with the assistance of a Tagalog interpreter, outside Father's presence, and discussed the case plan. It was during this meeting Mother signed the referrals for counseling and parent education. At the time of the hearing, four months later, Mother's referrals were still pending. As to counseling, Mother was on the waitlist for "a Tagalog interpreter counselor." Mother was also on the waitlist for the parent education class. Sandoval explained the referrals had to be signed to start the services as the referrals are not processed or provided to service providers without the parent's signature. Sandoval had not sought to expedite Mother's referrals, and even if the referrals were expedited,

13

Sandoval did not know whether the service providers could accommodate Tagalog. Sandoval explained it was impossible for Mother to participate in the counseling or parenting class services with her referrals still pending.

As for the 730 evaluation, Sandoval spoke to Greenzang's office once, but she could not remember when, and the office was trying to get a Tagalog interpreter for Mother. Sandoval had given Mother information to contact Greenzang's office. She did not know if the office had reached out to Mother. She also did not know if Mother had attempted to contact Greenzang's office.

Mother was not participating in substance abuse testing or treatment. Sandoval gave Mother information concerning substance abuse testing and informed Mother what she had to do to start testing, but Mother had not done any testing. Sandoval provided Mother with a community resource packet and highlighted the outpatient treatment programs for her. She did not offer Mother information on how to find a substance abuse treatment program accessible by public transportation that could accommodate a Tagalog speaker. Sandoval explained to enroll in a substance abuse treatment program, the parent had to call the outpatient program and request an intake to start the process. The resource packet Sandoval gave Mother was in English, but Sandoval used a Tagalog interpreter when she provided Mother with the information. Sandoval used a Tagalog interpreter to talk to Mother about her services, and Mother never indicated she did not understand the information being provided or that she required assistance.

As of the hearing, Mother had not made progress with the self-help meetings requirement of her case plan. Sandoval informed Mother she needed to participate in the self-help meetings but did not provide her with guidance on how to find them.

Regarding visitation, the parents visited the minor together. Their visits were positive as they were engaged with the minor and Mother was very attentive, but their visitation was inconsistent. The parents were authorized eight hours of weekly supervised visits. However, they commonly used only two of their eight hours of visitation. They had not completed their eight hours of weekly supervised visits as they cancelled visits, were no-shows at some, or arrived late. The parents were informed of the minor's doctor's appointments and encouraged to attend, but they had not. When the minor had heart surgery, the parents were not at the hospital.

Sandoval testified regarding her use of an interpreter in communicating with Mother. In all but one in-person contact Sandoval had with Mother, Sandoval used a Tagalog interpreter; Mother declined the use of an interpreter at their November meeting. Sandoval used an interpreter service when she called and left messages for Mother, as well as when she sent Mother text messages. Mother communicated in English at times. The text-message chain regarding the minor's medical appointments included the parents, the minor's caregiver, and Sandoval and was in English. Mother never indicated she did not understand the text-message chain. Nor did she express a lack of understanding regarding what was required of her for her service plan. When Sandoval asked Mother if she understood what Sandoval was saying regarding her case plan, Mother responded affirmatively.

In her reports, Sandoval noted she observed some odd behavior by Mother suggesting Mother might have a lack of comprehension. The minor's caretaker had also expressed concerns about Mother's ability to comprehend things. Sandoval was aware Mother's cognitive and intellectual abilities and potential learning disabilities were an issue in the case.

Sandoval testified her recommendation was to terminate family reunification services because she believed it unlikely the parents would reunify by the 12-month review date as they had not participated in or made efforts to complete their case plan services. They were inconsistent in their visits with the minor and had not attended the minor's medical appointments. The Agency was concerned about the parents' substance abuse history and neglect of P.R., the minor's sibling. The parents were not engaging in services to complete their case plan for P.R.'s case. The Agency believed if the minor was returned to the parents, it could be detrimental to the minor's safety and well-being.

After hearing argument, the court found reasonable services had been provided or offered to the parents to address the issues that brought the case before the court and their progress toward alleviating or mitigating the causes necessitating placement was minimal. The court terminated reunification services and scheduled a section 366.26 hearing. The court explained the parents had not attempted to begin working on any part of their case plan or kept up with the minor's medical issues or appointments. The court recognized the 730 evaluation of Mother had not taken place but indicated even if it had "and it was determined that there were some mental limitations," it was "not likely that these problems would be sufficiently remedied so as to result in the [minor's] . . . timely return." The court noted the parents failed to maintain necessary contact with the social worker, requiring her to go find them. They were inconsistent with visitation and visited less than their allotted time.

Mother filed a petition for extraordinary writ review of the juvenile court's orders, and a panel of this court issued an order to show cause.

DISCUSSION

Mother contends the juvenile court erred by finding she was provided reasonable services and by setting a section 366.26 hearing. We agree.

*A. Governing Principles*

Under California's child welfare law, "when a child is removed from a parent's custody, the juvenile court ordinarily must order reunification services to help the parent address the conditions that led to the child's removal." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 620 (*Michael G.*); §§ 361.5, subd. (a), 362, subd. (d).) "Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Michael G., supra*, 14 Cal.5th at p. 624.)

"To balance the interest in family preservation with the child's interest in the prompt resolution of her custody status and long-term placement, the dependency law establishes a detailed timeline for reunification. For qualifying parents, the minimum length of reunification services depends on the age of the child at the time of removal. [Citation.] Parents of children under three are presumptively eligible for at least six months of reunification services." (*Michael G., supra*, 14 Cal.5th at p. 625.)

"During the reunification stage, the juvenile court must hold periodic review hearings to evaluate the status of reunification efforts and appropriate next steps. [Citation.] These review hearings ordinarily take place at six-month intervals. At each review hearing, a court evaluates, among other things, the adequacy of the reunification services offered or provided and the extent of the parent's progress. If, at the six- or 12-month status review hearing, the court finds that there is a substantial probability

17

the child may be returned to her parent within six months, or that reasonable services were not provided to the parent, the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning. [Citations.] The court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.' [Citation.] In other words, at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G., supra*, 14 Cal.5th at p. 625; accord, *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424; §§ 366.21, subd. (g)(1)(C)(ii) [court shall not order § 366.26 hearing "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent"], 366.21, subd. (g)(4) [court shall order hearing pursuant to § 366.26 only if "there is clear and convincing evidence that reasonable services have been provided or offered to the parents"].)

Although section 366.26 "does not define 'reasonable services,' the Courts of Appeal have generally held that, to support a finding that services were reasonable, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .'" (*Michael G., supra*, 14 Cal.5th at p. 625, fn. 6.) The agency "must make a good faith effort to provide reasonable services responsive to the unique needs of each

18

family, and the plan must be ""specifically tailored to fit the circumstances of each family"" and ""designed to eliminate those conditions which led to the juvenile court's jurisdictional finding."" [Citation.] . . . The adequacy of the plan and the agency's efforts are judged according to the specific circumstances of each case. [Citation.] And "'[t]he effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success.""" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420, accord, *In re K.C.* (2012) 212 Cal.App.4th 323, 329–330; *In re J.E.* (2016) 3 Cal.App.5th 557, 566.) "[T]he reasonableness of the services provided may depend to some degree upon the parent's willingness to cooperate in the completion of his or her reunification plan." (*In re K.C., supra*, 212 Cal.App.4th at p. 330.) "'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'" (*In re J.E., supra*, 3 Cal.App.5th at p. 566.)

"The juvenile court's finding that reasonable services were provided is reviewed for substantial evidence. [Citation.] Substantial evidence is that which is reasonable, credible and of solid value." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238 (*T.J.*), disapproved on another ground in *Michael G., supra*, 14 Cal.5th at p. 631, fn. 8.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.] It must be ""sufficiently strong to command the unhesitating assent of every reasonable mind."""" (*T.J., supra*, 21 Cal.App.5th at p. 1238.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable

19

fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

*B. Analysis*

The juvenile court's finding Mother was provided reasonable reunification services is not supported by substantial evidence. The Agency developed, and the court ordered, an appropriate case plan for Mother, requiring counseling, parental education classes, a 730 evaluation, an outpatient substance abuse treatment program, substance abuse testing, and self-help meetings. There were two major difficulties in executing the plan: (1) Mother vacillated between agreeing to engage in services and refusing them;[5] and (2) Mother required services provided in Tagalog or a Tagalog interpreter for the services.

The combination of these two adversities resulted in Mother still being on the waitlist for counseling and parent education classes in December, eight months after the disposition hearing. Because Mother was on the waitlist for these services, they had not yet been provided to her.

---

[5] At the jurisdiction and disposition hearing in April, Mother expressed her willingness to engage in the case plan. However, when Sandoval met with both parents in June, Father declined to sign the referrals or to participate in his case plan services, and Mother followed suit. But in August, when Sandoval spoke to Mother outside of Father's presence, Mother signed the referrals for services and agreed to participate in her case plan and the 730 evaluation. When Sandoval talked to both parents together in November, in English, they acknowledged they were not participating in the case plan services.

Sandoval testified it was not Mother's fault she had been on the waitlist since signing the referrals. She was unsure if the service providers were going to be able to provide the services in Tagalog or with an interpreter once Mother got off the waitlist.

We recognize Mother did not sign the referrals until August, four months after the disposition hearing. But after she did so, she lingered on waitlists for these services for an additional four months. This is unacceptable. Although the amount of time Mother spent on the waitlists may not be the Agency's fault, as the six-month review hearing drew closer, the Agency did not seek to advance Mother's place on the waitlists or find alternative providers for these services. The Agency's only action was to determine Mother's place on the waitlists. "Maintaining Mother on a waiting list was not equivalent to 'providing' or 'offering' services." (*T.J., supra*, 21 Cal.App.5th at p. 1242.)[6]

While it is possible Mother would not have participated in counseling or parent education classes as the Agency asserts, she was never given an opportunity to do so. At times she was amenable to engaging in these services, especially when asked separately from Father. Until Mother was off the waitlist and these services available to her, we cannot conclude she would have refused them. (*In re K.C., supra*, 212 Cal.App.4th at p. 331

---

[6] At oral argument, the Agency argued Mother also could have accessed other counseling or parenting courses through the community resource packet that had been provided to her. But our record does not show Mother was told she should seek these services elsewhere due to her place on the waitlists for counseling and parenting. Additionally, Mother would have still needed a Tagalog interpreter to participate in these services.

["A person may not want to undergo treatment, but that does not mean [s]he will refuse to do so when the treatment is offered"].)

Similarly, we cannot say, on this record, Mother was provided the 730 evaluation as part of her reunification services. Mother contends this evaluation was necessary "to identify an accurate 'starting point'" for her case plan. In June, Greenzang was appointed to conduct the evaluation and the court authorized funding for a Tagalog interpreter, but the evaluation was never performed. Sandoval contacted Greenzang's office only once and a staff member advised they were working on obtaining a Tagalog interpreter. There is no evidence in this record Greenzang's office ever contacted Mother to schedule an evaluation or whether Mother contacted Greenzang's office to schedule it. What we do know is Mother never received the evaluation. Without it, the Agency and the court were operating with unknowns. Social workers, the minor's caregiver, and nurses all expressed concerns about Mother's cognitive abilities. Without the ordered evaluation, it was unknown if additional services were necessary to assist Mother or allowances needed to address her cognitive abilities or mental health issues. (*T.J., supra*, 21 Cal.App.5th at p. 1241 ["when a parent has a mental illness or disability, that condition must be the 'starting point' for a family reunification plan, 'not its conclusion'"].)

As for the substance abuse treatment program and self-help meetings requirements of Mother's case plan, even if we put aside the unanswered questions about Mother's cognitive and mental health issues, there remains the issue of her access to these services without an interpreter. Since an interpreter was ordered for Mother's counseling and parenting classes, Mother would likewise need an interpreter for the substance abuse

22

treatment program and self-help meetings or for them to be provided in Tagalog for her to understand their concepts and to participate in them.

We find *In re J.P.* (2017) 14 Cal.App.5th 616 informative on this issue. There, the father spoke only Burmese and required alcohol-related services. (*Id.* at p. 620.) The agency recognized the treatment would only be effective if the father understood the program's concepts. It looked for, but could not find, a treatment program with a Burmese translator. (*Ibid.*) Due to the father's limited English, he was unable to drug test randomly and this requirement was modified to on-demand testing. (*Ibid.*) On appeal, the father argued the juvenile court erred by ordering him to complete programs his language barrier prevented him from completing. (*Id.* at p. 622.) The Court of Appeal concluded the father "could not participate in the programs, due to his language barrier." (*Id.* at p. 625.) Because the agency could not provide the father a "realistic treatment program" given his language barrier (*id.* at p. 626), the juvenile court had ordered a reunification plan the father could not comply with, dooming him to fail. (*Id.* at pp. 617–618.) Thus, the appellate court held the juvenile court abused its discretion by failing to order effective reunification services. (*Id.* at p. 624.)

Here, it appears from the record the Agency did not look for a substance abuse treatment program with a Tagalog interpreter for Mother. And the Agency did not assist Mother in finding self-help meetings in Tagalog. Sandoval testified to engage in the self-help meetings, "[p]arents would need to just locate a location near their home and they would just go and participate whatever the hours work for them." Without the assistance of an interpreter or an outpatient treatment program or self-help meetings in Tagalog, Mother could not participate in these services, and they remained

23

inaccessible to her. (*T.J., supra*, 21 Cal.App.5th at p. 1244 [services must not only be tailored but be accessible].)

The record does not contain substantial evidence supporting the juvenile court's conclusion reasonable services were provided by the Agency. Thus, we conclude the court erred in terminating services at the six-month review hearing and setting a hearing under section 366.26.

"When it appears at the six-month review hearing that a parent has not been afforded reasonable reunification services, the remedy is to extend the reunification period, and order continued services." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973–974.) Section 366.21, subdivision (e)(3) provides the juvenile "court shall continue the case to the 12-month permanency hearing" if it finds at the six-month review hearing reasonable services were not provided. Here, had the court found reasonable services were not provided on the date the six-month review hearing was completed, Mother would have received reunification services for at least an additional 3 months 23 days. We agree with the parties an appropriate remedy is for the juvenile court to extend Mother's reunification services for this amount of time, after this court's decision becomes final. The 12-month review hearing should be set immediately thereafter.

### DISPOSITION

The petition is granted. Let a writ of mandate issue, directing the juvenile court to (1) vacate its December 18, 2024 finding reasonable services were provided to Mother; (2) enter a new finding reasonable services were not provided to Mother; (3) vacate its order terminating reunification services and setting a selection and implementation hearing under section 366.26; (4) order the Agency to provide Mother reunification services for at least

24

3 months 23 days after finality of this decision; and (5) set the 12-month review hearing thereafter.

This decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

MOTOIKE, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.